254 N.J. Super. 668 (1992)
604 A.2d 197
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DIANE MEDINA AND MICHAEL FEATHERSTON, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 24, 1992.
Decided March 19, 1992.
*670 Before Judges J.H. COLEMAN, BILDER and STERN.
Joseph J. Benedict argued the cause for appellants (Benedict, Altman & Swanson, attorneys; Joseph J. Benedict and Doris E. McNeil on the brief).
Mildred Vallerini Spiller argued the cause for respondent (Nicholas L. Bissell, Jr., Somerset County Prosecutor, attorney; Gilbert G. Miller, Asst. Prosecutor, of counsel; Mildred Vallerini Spiller on the brief).
The opinion of the court was delivered by STERN, J.A.D.
Defendants were jointly indicted for possession with intent to distribute one-half ounce or more of cocaine, contrary to N.J.S.A. 2C:35-5a(1) and -5b(2) (count one). Featherston was also indicted for using a remotely activated paging device during the commission of the possession with intent to distribute, contrary to N.J.S.A. 2C:33-20 (count two). Defendants were jointly represented and tried together. They were both convicted on count one, and Featherston was convicted on count two. Medina was sentenced to an indeterminate term, not to exceed 5 years, and fined $1,000. A $2,000 DEDR penalty and $30 VCCB penalty and $50 lab fee were also imposed. Her driver's license was suspended for six months. Featherston received an indeterminate term not to exceed 7 years for the possessory offense and a concurrent indeterminate 18 month *671 sentence for the illegal use of a paging device. Featherston was fined $2,000, received a $2,000 DEDR penalty, aggregate $60 VCCB penalty and $50 lab fee. His license was also suspended for six months.
On this appeal defendants jointly argue:
POINT I EVIDENCE ELICITED ON CROSS-EXAMINATION REGARDING DEFENDANT FEATHERSTON'S PRIOR ARREST WAS CLEARLY INADMISSIBLE AND PREJUDICIAL AND, THEREFORE, A NEW TRIAL SHOULD HAVE BEEN GRANTED.
POINT II THE CONVICTIONS WERE TAINTED BY PROSECUTORIAL MISCONDUCT AND, THEREFORE, SHOULD BE REVERSED.
POINT III THE JURY CHARGE WAS IMPROPER AND, THEREFORE, A NEW TRIAL SHOULD BE GRANTED.
A. Certain Portions Of The Jury Charge Were Prejudicial To Defendants And, Therefore, A New Trial Should Be Granted. (Not Raised Below).
B. The Jury Charge As To The Second Count (Possession Of A Paging Device) Was Overly Broad And, Therefore, A New Trial Should Be Granted.
POINT IV THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE; THEREFORE, A NEW TRIAL MUST BE GRANTED.
In order to understand the contentions and our holding, we briefly recite the essential testimony and developments at trial.

I.
In June 1990 the Franklin Township Police Department and the Border Anti-Drug Team of Middlesex and Somerset Counties (BADT) conducted an investigation of suspected drug activity involving Featherston. The investigation led to surveillance of Featherston's home in Franklin Township and ultimately to the issuance on July 7, 1990 of a search warrant which authorized a search of Featherston's person, his residence and his car, and the 1985 silver Nissan belonging to his girlfriend, defendant Medina.
After procuring the warrant, the raid team determined that Featherston was not at home and "disbursed throughout Franklin Township trying to locate" Featherston or his vehicle. They ultimately received information that Featherston would be *672 in the area of Route 27 near the Four Musketeers Restaurant "for a possible drug transaction."
At approximately 9:30 p.m. on July 7, 1990 the police observed Featherston and Medina entering the Four Musketeers Restaurant. The two subsequently left the restaurant and entered Medina's car which the police stopped on Route 27. Detective Fitzgerald and Officer Price "approached the vehicle ... and relayed to Michael Featherston that [they] in fact did have a search warrant for his person, the vehicle, [and] his residence." A patdown of Featherston revealed an "activated" "paging device" which was turned on and capable of receiving incoming calls. While the police did not conduct a thorough search of the vehicle at that time, they did conduct a brief search of the car for weapons and, finding none, "secured" the vehicle. They thereafter went to search Featherston's home.
At trial, Lieutenant Andrew Racz of the Somerset County Prosecutor's Office testified that he had a conversation with Featherston as the house was being searched. According to Racz, Featherston volunteered to aid the police in the apprehension of one Jose Crespo who, approximately six months earlier, "was a target of a previous investigation" in which "a quantity of CDS and money ... and a weapon was seized." Featherston told Racz that "Crespo had stopped at his [Featherston's] house the previous Saturday and wanted him to travel to New York City to purchase a quarter pound of cocaine." Featherston further indicated that he was "willing to cooperate" with the police in "an effort to arrest this Mr. Crespo in the process of purchasing this cocaine."
Following the conversation, Detective Stuart Buckman of the Somerset County Prosecutor's Office informed Racz that the search of Featherston's bedroom led to discovery of a loaded "nine millimeter Beretta handgun" (for which Featherston had a permit) with "a clip with bullets in the gun and a clip next to the gun." Buckman noted that the gun "wasn't like a stored weapon in a gun case, it was found loaded under a cushion," in *673 Featherston's bedroom. Ammunition was also discovered, as were lists of names and numbers identified as "drug lists."
Following his conversation with Featherston, Racz undertook a complete search of the Medina vehicle which produced "a plastic bag containing a white granular substance." After "retrieving" the plastic bag from the trunk, Racz "entered the residence," and "immediately upon seeing [Racz] with [the] bag" Featherston told the Lieutenant "[o]h that's nothing, that's just soap powder that I used to get the stains out of my jeans."
Racz gave the bag to Detective Fitzgerald and requested that he "field test the substance." However, the test was not conducted because, although they had a "marijuana field test kit," they "didn't have a cocaine field test kit" with them at the time. Racz informed Featherston that the substance "would be sent to the State Police Lab for a positive identification" and that Racz would conduct a field test on the substance when he returned to headquarters. Defendants were not then arrested.
Featherston testified at trial and claimed that the police did test the substance taken from the car in a "vial" or "test tube" and discovered that it was "soap." According to Featherston, Fitzgerald reported to the others, "I can't believe we got soap." Featherston also testified that the lists of people, with numbers beside the names, retrieved from his bedroom did not relate to drugs. Rather, they were members of a softball team to which he belonged or the names of "people who owed money to Diane [Medina] or myself for loans."
Medina also testified at the trial and verified Featherston's assertions regarding the lists seized during the search. She testified that on her eighteenth birthday in November 1989 she received the proceeds of a settlement from a car accident which amounted to $72,000.00. She further testified that she gave $25,000 to her parents and spent the rest by sponsoring a *674 softball team and lending money to the people on the list.[1]
Racz testified that upon returning to BADT headquarters, he performed a field test on the confiscated substance and that the result was "in fact positive for cocaine." According to Racz, when Featherston was told of the results, he "accused" Racz of "putting cocaine into that substance." According to Racz, "because of those accusations, allegations ... I was told not to cooperate with him."
Eve Momyer, a woman who lived with Featherston's father, Leonard Michael, testified that she and the father arrived at the home during the search at approximately 12:15 a.m. of July 8, 1990. After the police left the premises, Ms. Momyer noticed "paraphernalia sitting on the desk." Featherston's father identified it as "testing equipment" consisting of "an individual test tube, another box and a small packet of smaller test tubes." Ms. Momyer and Leonard Michael put the items into a plastic bag and on October 19, 1990 took them "to Winston labs for analysis."
State Police Senior Forensic Scientist Songza Park testified for the State that, as of the summer of 1988, "the law was changed" and chemists who test for CDS did not have to "do quantitation on the specimens and the weight goes out as it is."[2] Park found there were "two distinctive textures of powder forms in the specimen." The detergent was on the bottom, and "on the top in the corner it was pure white powder *675 ... that was cocaine." She determined the "total gross weight" of the specimen to be 26.23 grams, a quantity greater than "a trace amount of cocaine." The defendants' expert Marvin Winston testified that he tested a vial brought to him by Featherston's father and concluded "there was no cocaine in the vial."[3] Pursuant to a court order, Winston also performed a chemical analysis on the same sample tested by Park and found "only basically a possible trace of cocaine present." Brian O'Brien, another defense expert, testified that the 26 grams contained "point zero zero two percent" or a "trace amount" of cocaine reflecting what he called an "accidental mixture." In O'Brien's opinion, "this product is not distributable. It would be offensive and abrasive for somebody to use." He said "[i]t has no value in the drug market. It could not be distributed to anyone." O'Brien also testified that CDS distribution usually evidences "weighing devices ... packaging devices [and] ... large sums of money," none of which were confiscated by police from the home or car.
As part of the State's case Sergeant Timothy Wenzel of the Somerset County Prosecutor's Office testified, as an expert, that the quantity of cocaine involved "would not be typical[ly]," for mere use, and that the weapons and bullets, lists with numbers thereon, beeper and other observations by the police were "typical of somebody possessing cocaine for distribution."

II.
Featherston argues that on his cross-examination the prosecutor improperly extracted evidence of a prior arrest and therefore he is entitled to a new trial.
In a certification supporting his pretrial motion for additional discovery designed to obtain the expert analysis, Featherston detailed his defense and stated that Racz told him "that if I did *676 not cooperate (I believe he wanted me to do some controlled buys), he would put the screws to me." Featherston further stated
I believe that members of the raid party added cocaine to the soap. I know that members of the Franklin Township Police Department were well aware of the fact that I was arrested and charged with a drug offense as a juvenile. These charges were subsequently dismissed. I believe that members of the Franklin Police Department have the incentive to frame me.
On his direct testimony at trial, Featherston testified that, in response to a statement made during the search about a tip the police received, he told Racz that about a month before "some dude named Poppo came to my front door, forced his way in and said he had a proposition for me, him and his friend." He testified he was offered "$4000 to go to New York to buy a quarter pound of cocaine" for him, but that he told Poppo that he was "nuts ... [t]hat ain't me, man" and refused. According to Featherston, after he "recounted this story to Drew Racz," the Lieutenant denied any involvement in the incident and said it was "the first we have heard of it." As "Poppo" was a former coworker, Featherston offered to find his address, and Racz asked him to "get in touch with me in a couple days with any information you got on him or anybody else." Featherston responded, "I can do that ... That won't be a problem." Racz left his name and telephone and beeper numbers on a business card that was admitted into evidence.
According to Featherston, Racz called him shortly thereafter, at 3:30 in the morning, and said "I got some bad news for you, kiddo. That soap we took from you has turned into cocaine." According to defendant, when Featherston said "I don't know what happened to it, but I am telling you that stuff was soap," Racz suggested that he "just admit to it ... [i]t would be a lot easier on you." When Featherston pointed out that he saw the soap tested, Racz said "[n]o, you didn't ... That was the THC tester" and "[f]orget about what happened there." He said that if the substance tested "positive" by the State Police defendant would be charged with possession with intent "[a]nd that holds a lot of weight in Somerset County" for which he *677 would "go away for ten years if you get convicted of that." Featherston told Racz "I don't want to get convicted of anything. I told you I would come in and help you if you wanted my help." Defendant said Racz reacted negatively to his accusation of "planting something" and said "I don't even want to work with you now."
On his cross-examination, the following exchange took place:
Q. Have you ever told anybody or stated in any papers or written down on any piece of paper that you knew Franklin Police Department were out to get you?
A. I don't recall talking to anyone or writing anything down of that nature, no.
Q. Do you have any idea why the Franklin Police Department would be out to frame you?
A. No.
Q. Do you recall filing a certification with the Court in this particular matter?
A. Excuse me.
Q. Do you recall filing a certification with the Court in this particular matter?
A. I may have.
* * * * * * * *
Q. I will show you S-15. If you could just look through that and see if it refreshes your recollection.
A. Okay.
* * * * * * * *
Q. Why would Franklin Police Department have an interest in framing you?
A. I guess 'cause I was arrested in 1986 and was not convicted.
Without objection the colloquy continued:
Q. You were arrested on what charges?
A. Possession of CDS with intent to distribute.
Q. Cocaine, right?
A. Yes.
Without objection, the following then occurred.
Q. There was a motion to suppress granted in that case, right?
A. Yeah.
Q. So in your opinion, because they had arrested you once before, and they had to dismiss charges because of a legal technicality, you thought they were taking a second shot at you?
Defense counsel (not present counsel) then objected, but defendant responded "[y]es."
*678 The trial judge thereupon called for a sidebar discussion. The prosecutor argued that he was not attempting to impeach Featherston's credibility by reference to the prior arrest. Rather, he sought to impeach Featherston's credibility by demonstrating a prior inconsistent statement because he had testified at trial that the police contaminated the soap sample because "he wouldn't cooperate with ... Racz," whereas in his certification Featherston stated that the soap was contaminated because of vindictiveness following dismissal of the charges.
It is settled that introduction of evidence of prior arrests is improper as a basis for impeaching a witness' credibility. State v. Hutchins, 241 N.J. Super. 353, 359-360, 575 A.2d 35 (App. Div. 1990). As noted in Hutchins, we have previously made "clear that where defendant's case rests upon his credibility, admission of testimony or the posing of questions concerning defendant's prior arrest, constitutes plain error and requires reversal of the conviction, and a new trial." Id. at 360, 575 A.2d 35. See also State v. Dunphy, 19 N.J. 531, 536-537, 117 A.2d 617 (1955); State v. Cooper, 10 N.J. 532, 555-556, 92 A.2d 786 (1952); State v. Searles, 82 N.J. Super. 210, 215, 197 A.2d 384 (App.Div. 1964).
However, the prosecutor (not trial counsel) now argues he "was not attempting to use the prior arrest in the traditional sense of attacking a criminal defendant's credibility, i.e., using prior crime as relevant to law abiding status and thus relevant as to the issue of veracity." The prosecutor, rather, claims the right to attack his credibility by demonstrating the inconsistencies in Featherston's defense by showing the different reasons attributed for the alleged "frame-up." Arguably, and assuming some inconsistency, any response to a question concerning the certification would have "opened the door" for further questioning.[4] Nevertheless, the scope of the cross-examination *679 directed to the nature of the prior charges and, especially, the reason for the dismissal was improperly developed, and should have been excluded, if only under Evid.R. 4. The fact that Featherston testified that he had been "framed" did not justify development of the fact that the prior charges were dismissed because of a motion to suppress on a "technicality."
It may be suggested that the objection to the prosecutor's reference to the "technicality" was sustained, but there was no direction to disregard the affirmative answer, and some responses are so prejudicial they cannot be disregarded. See Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476, 485 (1968); State v. Morant, 241 N.J. Super. 121, 136, 574 A.2d 502 (App.Div. 1990). In any event, defendant testified that a motion to suppress had been granted, and there can be little doubt, in context, that the jury was led to understand that defendant escaped conviction for a similar offense and did so only because of a legal "technicality." The reality is that the prosecutor revealed indirectly what he was prohibited from proving directly  a predisposition to commit a crime by virtue of defendant's prior similar misconduct. Cf. State v. Arnwine, 67 N.J. Super. 483, 486-87, 171 A.2d 124 (App.Div. 1961) ("[t]hrough no fault of his own, defendant under relentless inquiry was obligated to disclose that he had previously been charged with [a similar offense]. We are strongly of the view that this prior charge may have, in the minds of the jury, lent color to the truth of the charge on which defendant was standing trial. It seriously prejudiced his case and amounted to plain error") (emphasis in original). See also Evid.R. 47, 55.
*680 Medina testified on cross-examination that the frame-up occurred because "they didn't find nothing." When the prosecutor asked about Featherston's "prior encounter" with the Franklin Township police, an objection was sustained and the judge declined to permit the inquiry even with a limiting instruction. The prosecutor referred to Medina's pretrial certification which was similar to Featherston's and to the fact he was trying to inquire as to "what was in her mind," but the judge ruled it inadmissible because of irrelevance and because "under rule four, we've heard enough about that and the potentiality for bias and prejudice, in my mind, is a concern, and would outweigh whatever probative value it may have as to the credibility of this witness." Further, before summations he directed counsel not to refer to the prior arrest. The trial judge, however, denied a new trial because of the "prior arrest" issue, noting that no curative instruction was given because none was requested and that defense counsel may have believed that the testimony supported the defense. Moreover, he noted that the questions regarding the prior arrest related to Featherston, that they were not related to Medina, that she was convicted and, therefore, suggested that there could have been no undue prejudice to Featherston.
Because defendant asserted that he was framed, the prosecutor had the right to develop the subject and could test defendant's credibility with respect thereto. It is not suggested that reference to a prior, counseled certification filed in furtherance of a pretrial discovery motion could not be referred to for purposes of impeachment. See and compare, e.g., Michigan v. Harvey, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990); James v. Illinois, 493 U.S. 307, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990); Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). However, the scope of the cross-examination must be tailored to preserve fairness and prevent undue prejudice. Here, the cross-examination of Featherston developed under the guise of attacking credibility, *681 constituted not only a challenge to the defense of "frame-up" because of hostility over dismissal of charges previously filed, but brought out that Featherston was arrested for similar conduct before and got off on a "technicality," and that the same abhorrent conduct occurred again. The inference was clear  Featherston was predisposed to sell drugs and this jury should not let him get away with it a second time.
We recognize that prosecutors cannot be expected to do battle in the adversarial ring with two hands tied behind their backs. The cases are legion with respect to their rights as adversaries as well as their duties and obligations. See e.g. State v. Ramseur, 106 N.J. 123, 320, 524 A.2d 188 (1987). Despite the merits of the cause or their zeal for a result, our constitutional system of justice survives because the means of obtaining a conviction is as important as the conviction itself.
In essence, the proofs in this case were far from overwhelming. Defendants were convicted of second degree possession with intent to distribute because of the quantity involved. See N.J.S.A. 2C:35-5a(1), -b(2). Neither party claims the quantity of pure cocaine or the quality of the substance was relevant to the charge, see State v. Torres, 236 N.J. Super. 6, 9-11, 563 A.2d 1141 (App.Div. 1989). Nevertheless, in light of the testimony of the defense experts that only two parts per 1,000 were cocaine and, therefore, could not have been for distribution, the defense was plausible  defendants could not be intending to distribute the substance and did not possess it to distribute, and that they were "framed" by police who themselves added a small quantity of cocaine to Featherston's laundry powder. Under these circumstances, we cannot find that the improper cross-examination about the prior disposition was harmless or did not deprive defendants of a fair trial. See e.g. State v. Pennington, 119 N.J. 547, 565, 575 A.2d 816 (1990); State v. *682 Ramseur, supra, 106 N.J. at 322, 524 A.2d 188 (1987).[5]

III.
It may be suggested, as the trial judge did, that reference to Featherston's prior arrest had no direct impact on Medina. However, their joint defense was that they both were framed. Because of the possibility the jury rejected the defense as to Featherston because of prosecutorial misconduct, Medina had to be similarly prejudiced as well. Further, here Medina was tried as an accomplice of Featherston, and under the facts of this case and the instructions given to the jury, her liability was premised on the proof of Featherston's wrongdoing developed at the joint trial. In the circumstances, the reversal of Featherston's conviction mandates reversal of the judgment against Medina.

IV.
The need for a retrial requires us to mention the question of joint representation by counsel. We recognize that, under our law, defendants can seek joint representation, and it can be permitted upon knowing, intelligent waivers of the right *683 to independent counsel developed on the record. See R. 3:8-2. See also e.g. State v. Bellucci, 81 N.J. 531, 410 A.2d 666 (1980); State v. Land, 73 N.J. 24, 372 A.2d 297 (1977). Such representation makes sense for economic and other reasons when the defenses are consistent. However, there may develop at any trial an unexpected and unforseen event which may require employment of different tactics or strategy for the benefit of an individual defendant. The same is true on appeal. In this case, the proofs reflect that Featherston was the most culpable, and the prosecutor's misconduct was essentially more prejudicial to him. The disposition as to both defendants did not, therefore, necessarily have to be the same. In response to our questions at argument, appellate counsel for defendants (who, as we have noted, did not try the case) acknowledged his approach to the appeal as if the defendants' case "rise or fall together" and candidly admitted that they might more appropriately be represented by separate counsel. As no issue regarding joint representation is raised on this appeal by either the defendants or the State, we do not address the issue further. However, we do direct that the question of joint representation be fully explored before the retrial. See R. 3:8-2.

V.
The State does not argue that Featherston's conviction on count two can survive a reversal on count one. Count two charged Featherston with use of a remotely activated paging device "while engaged in the commission of" possession of cocaine with intent to distribute. We do not decide that a conviction for using a paging device incident thereto must automatically be vacated merely because a drug conviction is reversed. The basis for reversal may be significant. Here the judge instructed the jury that "if you find the [d]efendant did not possess cocaine with intent to distribute, then [he] cannot be found guilty of this charge," and, in any event, the prejudice incurred at the trial affected both counts.
*684 Because count two must be retried we briefly address defendant's challenge to the trial judge's instructions on that count. Both parties have encouraged us to do so in the event we directed a new trial.
N.J.S.A. 2C:33-20 provides:
A person is guilty of a crime of the fourth degree if he uses a remotely activated paging device while engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit any crime or offense enumerated in Chapter 35 or 36 of Title 2C of the New Jersey statutes. (emphasis added).
The judge told the jury:
So, to find the defendant guilty on this charge, the State must prove beyond a reasonable doubt two things. That the defendant, Michael Featherston, used a remotely activated paging device; and two, that at the time he did so, he was engaged in the commission of a crime or possession of cocaine with intent to distribute.
Now, by the words, used a paging device, we do not mean that the pager was actually activated on the date in question. But we mean that the defendant had in his possession a paging device which could have been remotely activated at the time the offense occurred. (emphasis added).
As N.J.S.A. 2C:33-20 is a penal statute, it must be strictly construed, State v. Churchdale Leasing, Inc., 115 N.J. 83, 102, 557 A.2d 277 (1989), and the word "uses" must be interpreted to mean that the pager has to be "used," not merely "possessed," in connection with the drug offense, here possession with intent to distribute. On the motion for a new trial, the judge noted his concern that a defendant could escape penal liability by turning off the pager "when he realizes that he or she is to be arrested" so that "it would be off and theoretically not in use [which] would enable the defendant to avoid a conviction on this charge." However, the proofs, either direct or circumstantial, must reveal use of the paging device incident to the drug crime, not necessarily that the police observed the defendant use it or that it was on at the time of arrest.
While the trial judge may have properly expressed the elements of the offense, his instructions conveyed the impression that mere possession of a pager which could be activated at the time defendant possessed the cocaine with intent to distribute *685 it  without using it  sufficed to sustain the conviction.[6] In this respect, he erred.
The judge should have related the law he was charging to the facts the jury was being asked to decide. See State v. Concepcion, 111 N.J. 373, 379, 545 A.2d 119 (1988). Here, however, once the judge went beyond stating the elements of the offense, he did not go far enough in explaining what he meant concerning activation. By stating that the beeper did not have to be "actually activated on the date in question," the judge did not make clear if he was referring to defendant's act of turning on the beeper or to activation by people trying to communicate with him. The judge should have instructed the jury that in order to find that defendant "used" the paging device, it had to find that the paging device was "on" so as to have been capable of receiving signals and fulfilling its paging purpose. Further, the judge should have made clear that the jury had to find that, while engaged in the commission of the drug offense and in connection with that offense, defendant was or could have been contacted as a result of his use of the paging device.
A defendant must use the beeper, not merely possess it, incident to the drug offense. While defendant argued before the trial judge that there was insufficient evidence to sustain the conviction on count two[7] and, on his post-verdict motion that a new trial was warranted because of the charge, he failed to object to the instruction when it was given. In these circumstances, we do not have to decide whether the charge *686 mandates reversal of the conviction on count two, as "plain error," independent of any other ground.

VI.
The judgments of conviction are reversed, and the matter is remanded for a new trial.
NOTES
[1] The defense produced witnesses who borrowed money from defendants and used pagers to contact Featherston for legitimate purposes, including use incident to the softball team.

Featherston testified that during the house search the phone range and Officer Price answered the phone and said "[w]hy don't you come over, I'm in business" and that at approximately 1 a.m. in the morning one Kenny McCracken appeared at the residence. Featherston further testified that McCracken had never previously paid a visit at that hour and he had no knowledge as to why he appeared that morning.
[2] See the legislative history noted in State v. Torres, 236 N.J. Super. 6, 9-11, 563 A.2d 1141 (App.Div. 1989), certif. denied 122 N.J. 153, 584 A.2d 222 (1990).
[3] As noted, defendants, unlike the police, maintained that the police did perform a test at the house which was negative.
[4] The State seems to argue now both that the contention in the certification concerning the impact of the prior dismissal was inconsistent with the suggestion in Featherston's direct that he was "framed" because of a failure to cooperate (even though, according to both defendant and Racz, the decision not to pursue cooperation did not appear to be his), and that the certification mentioned two inconsistent bases for a frame-up, whereas defendant did not expressly mention a "frame-up" on his direct testimony. Under the latter theory, anything stated in the certification constituted an inconsistency which could be pursued at length for purposes of challenging credibility. We reject this suggestion. See Evid.R. 4.
[5] On his cross-examination of the defense expert, Brian O'Brien, the prosecutor asked if his opinion concerning the lack of drug activity would be different if the expert knew that "three people" whose names were on the list found in the Featherston house "had prior arrests for CDS and several others were known drug users?" There was no evidence to support the question, and the prosecutor argues before us that he was "merely testing the opinion of the expert." While we reject the contention that an expert can, without factual basis, be asked such a question, even if in response to answers to hypothetical questions asked on direct, we do not address the impact of the question because the trial judge sustained an objection. We note this and other possibly questionable conduct by the trial prosecutor because of our belief that it may have contributed to the conviction in a case which was, particularly in light of the testimony of defendants' experts, less than overwhelming. In any event, we need not pursue the subject of misconduct further because we are satisfied that the colloquy regarding the prior arrest constituted "plain error" warranting reversal.
[6] The indictment charged possession with intent to distribute on a particular date, July 7, 1990. Defendant could not have been found guilty under count two if he was not found guilty on count one. Given the charges in count two, he had to have "used" the pager on the date he committed the offenses embodied in count one.
[7] There was sufficient evidence. Among other evidence, Detective Fitzgerald testified that the paging device was "activated," "turned on" and "could receive incoming calls" at the time the Medina vehicle was stopped and Featherston was searched.