867 A.2d 1247

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JOHN A. DENOFA, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 14, 2004—Decided March 1, 2005.

Before Judges KESTIN, LEFELT and ALLEY.

*Stephen A. Caruso,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Caruso,* of counsel and on the brief).

*Charles Ouslander,* Deputy Attorney General, argued the cause for respondent (*Robert D. Bernardi,* Burlington County Prosecu-

tor, attorney; *Carol Lee Tang,* Assistant Prosecutor, of counsel and with *Mr. Ouslander,* on the brief).

The opinion of the court was delivered by

KESTIN, P.J.A.D.

Defendant, John A. Denofa, was charged with and convicted of a single count of murdering Rachel Siani. *See N.J.S.A.* 2C:11–3a(1) and (2). He was sentenced to a life-term of imprisonment with thirty years of parole ineligibility.

On appeal, defendant raises the following issues:

*POINT I* THE COURT'S FAILURE TO INSTRUCT THE JURORS REGARD-ING JURISDICTION, AN ESSENTIAL ELEMENT OF THE OFFENSE, DEPRIVED DEFENDANT OF THE RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. *U.S. CONST.* AMENDS. VI, XIV; *N.J. CONST.* (1947), ART. I, PARS. 1, 9, 10. (Not Raised Below)

*POINT II* THE TRIAL COURT ERRED BY ADMITTING THE IMPERMIS-SIVELY SUGGESTIVE IDENTIFICATIONS OF THE DEFENDANT INTO EVIDENCE.

*POINT III* THE FAILURE OF THE TRIAL COURT TO INSTRUCT THE JURY ON THE LESSER–INCLUDED OFFENSE OF AGGRAVATED MAN-SLAUGHTER CONSTITUTED A VIOLATION OF DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. *U.S. CONST.* AMENDS. V, VI, AND XIV; *N.J. CONST.* (1947), ART. I, PARS. 1, 9, 10. (Not Raised Below)

*POINT IV* THE SENTENCE IMPOSED BY THE TRIAL JUDGE IS EXCES-SIVE AND INAPPROPRIATE UNDER THE MANDATE OF THE CODE OF CRIMINAL JUSTICE.

We discern no error in the trial court's ruling that the out-of-court and in-court identifications of defendant by a police officer were admissible. Those identifications were not tainted by imper-missibly suggestive processes. *See Neil v. Biggers,* 409 *U.S.* 188, 196–99, 93 *S.Ct.* 375, 380–82, 34 *L.Ed.*2d 401, 409–11 (1972); *State v. Santoro,* 229 *N.J.Super.* 501, 504, 552 *A.*2d 184, 186 (App.Div. 1988); *State v. Bono,* 128 *N.J.Super.* 254, 262, 319 *A.*2d 762, 766 (App.Div.), *certif. denied,* 65 *N.J.* 572, 325 *A.*2d 705 (1974). The jury was properly instructed on the issue.

We also reject the argument, advanced for the first time on appeal, that defendant was entitled to a lesser-included aggravat-ed manslaughter charge notwithstanding his strongly articulated

objection to such a charge when the State requested its inclusion. There was no error in the trial court's evaluation of this issue, either, let alone plain error. *See State v. Jenkins,* 178 *N.J.* 347, 358–61, 840 *A.*2d 242, 249–51 (2004); *State v. Brent,* 137 *N.J.* 107, 113–16, 644 *A.*2d 583, 585–87 (1994).

We have determined, however, that, given certain critical facts established in the proofs, the trial judge's omission to charge the jury on the element of territorial jurisdiction was plainly erroneous. Accordingly, we reverse and remand for a new trial.

In March 2000, Siani, twenty-one-years old, was a college student, working as an exotic dancer at Diva's International Gentlemen's Club in Levittown, Pennsylvania. An Econo Lodge motel was connected to Diva's. The two establishments shared an adjacent parking lot.

Defendant was a regular customer at Diva's, present almost every Tuesday night after playing pool. He was friendly with all of the dancers at Diva's, including Siani. He was regarded as a generous tipper who bought the dancers drinks and sometimes took them out to eat.

Defendant frequently stayed overnight at the Econo Lodge rather than risk driving home from Diva's when he was tired or intoxicated. His driver's license had been suspended on one occasion for driving while under the influence. At times, Siani also stayed at the Econo Lodge if she had consumed too much alcohol.

William Love, a co-owner of Diva's and its director of operations, occasionally gave defendant drinks and cigars without charge, as well as vouchers for a discount rate at the Econo Lodge. He remembered seeing defendant "[b]uzzed," but never intoxicated.

On Tuesday, March 28, 2000, Siani worked the 4:00 p.m. to 10:00 p.m. shift at Diva's. Defendant was a customer that evening. Love, who was working that night, saw defendant and Siani sitting together at the bar during Siani's shift, talking to each other.

Buffy Varanese, an exotic dancer on the 9:00 p.m. to 2:00 a.m. shift that evening, first observed defendant shortly after 9:00 p.m. sitting at his usual spot at the bar. Varanese had known defendant as a customer of Diva's for about one-and-a-half years.

After Varanese finished her first dance set on stage, she walked around the bar to collect her tips and saw Siani and defendant sitting at the bar together, talking. Varanese joined them at the bar at about 9:30 p.m. and spoke with them for twenty to thirty minutes. Although defendant was drinking, he did not appear intoxicated. Defendant asked Siani to accompany him to Sportsters Bar in Falls Township, Pennsylvania to see Michelle Bupp, a former dancer at Diva's, then employed by Sportsters as a bartender. Siani refused, explaining that she was too tired. According to Varanese, defendant seemed upset with Siani's refusal.

Defendant left between 10:00 p.m. and 11:00 p.m., telling Varanese that he planned to go to Sportsters and return to Diva's later that night. Siani, having ended her shift, then went to the dressing room and changed her attire before leaving the premises.

Defendant checked into the Econo Lodge motel at 11:16 p.m. Diane Crouch, who had been the night auditor at the Econo Lodge since August 1999, knew defendant as a customer of the motel and recalled checking him in that night, into room 223 on the second floor. Crouch estimated that she had checked defendant into the motel between fifteen and twenty times while working the overnight shift from 11:00 p.m. to 7:00 a.m. Crouch was the only employee on duty during this shift. She had never seen defendant visibly intoxicated, including on the date in question.

Michelle Bupp recalled that defendant arrived alone at Sportsters Bar between midnight and 12:30 a.m. on March 29. Defendant "seemed to be all right." They engaged in "normal" conversation while she worked and defendant consumed a few drinks. Bupp felt that defendant had had enough to drink at that point and should not drive. After she closed her bar, Bupp sat and spoke with defendant for awhile. Defendant told Bupp that he had taken a taxi to Sportsters and he intended to stay at the Econo

Lodge that night. When defendant was unable to get a taxi back to the Econo Lodge, Bupp offered to drive him there on her way home. They left Sportsters at about 1:45 a.m. for the fifteen-minute drive to the Econo Lodge.

According to Bupp, she dropped defendant off at his red pick-up truck at about 2:00 or 2:15 a.m. He did not stumble or weave as he walked from the truck to the main entrance of the Econo Lodge.

At about the same time, Crouch, who had not seen defendant since he had checked into the Econo Lodge earlier that night, saw defendant through the lobby windows walking quickly across the fully illuminated parking lot. Defendant came around from the side of the Econo Lodge and headed towards the Diva's area of the parking lot. She thought it "rather odd" that defendant was in the parking lot at that time of night since, on other occasions, she had rarely seen him after he had checked in. Crouch acknowledged that she had no way of knowing whether defendant was accustomed to entering and leaving the Econo Lodge by using the rear doors rather than the front lobby. The room keys issued to guests provided access to the Econo Lodge through the rear doors.

In the meantime, Siani had returned to Diva's about 1:30 a.m. She was alone and did not appear to be under the influence of anything; however, according to Love, she seemed flustered and in a hurry. She walked into Love's office and asked if she could have a drink. Love refused the request because "last call" had already been announced.

Rebecca Yavorsky, a friend of Siani's who also worked as a dancer at Diva's, left the club that night between 2:15 and 2:30 a.m., accompanied by Siani and a bouncer named Doug. Siani went to her car parked in the lot, and dropped off her purse and a bag of food from Diva's. Doug then escorted the two women to Yavorsky's car, parked in the lot about five or six spaces from the front entrance of Diva's.

Siani accepted Yavorsky's invitation to "hang out" together in Yavorsky's car before going home. They sat in Yavorsky's silver Mustang for about thirty minutes, talking and smoking marijuana. Yavorsky noticed that Siani was holding keys on a lime-colored keychain and on a butterfly keychain. Siani was unhappy because she had wanted to "hang out" with Ken Shank, a disc jockey at Diva's, but he did not want her to come to his home that night. Yavorsky snapped a picture of Siani while they were talking in the car.

At about 2:30 a.m., Patrolman Kevin Burns of the Bristol Township Police Department drove into the parking lot of Diva's to write an incident report pertaining to a prior call. He chose that location because it was a fairly well-lit area. While circling the parking lot in his vehicle at a speed of about ten miles an hour, Burns observed two females sitting in a small gray car and a man, about twenty-five feet away, knocking on the front door of Diva's. The "whole area [was] lit ... with incandescent lighting.... [T]he canopy ... over Diva's door [ ] was all lit."

Burns observed the man's back and the side of his face. The man appeared to be white, about six feet tall, and 220 to 240 pounds. He was wearing a fairly heavy green varsity-type jacket, blue jeans and dark shoes.

After completing his circle, Burns parked his vehicle facing the front door of Diva's, about fifteen to twenty yards from its entrance. The man was still knocking on the front door and looking around to the left and to the right. Diva's closed at 2:00 a.m., and Burns thought it was strange that someone would be knocking on the door after hours for that length of time. Consequently, he placed a call on his police radio to have someone at headquarters make a phone call to Diva's to find out if there was a problem.

When Yavorsky saw Burns park his patrol car, she decided to leave because she and Siani had been smoking marijuana and she did not want a police officer to come over to her car. Yavorsky drove her car to where Siani's car was parked, about two spaces

from the front door of Diva's. She saw defendant under the illuminated front door canopy, leaning against the wall, knocking on the front door of Diva's. She recognized defendant as a customer of Diva's who generally became intoxicated when he was in the club. Defendant had turned his face to look in her direction when alerted by her headlights.

As Yavorsky pulled her car up to Siani's vehicle to drop her off, Siani saw defendant and said, "Oh, I'm going to go say hi to Jack real fast." Yavorsky asked Siani, who was "high" from smoking marijuana, if she wanted her to wait. Siani said, "No. There's nothing to worry about." As Siani left the vehicle, Yavorsky saw defendant turn completely around to speak with Siani. After observing them in conversation for a few seconds, Yavorsky drove out of the parking lot.

Burns observed Siani leave Yavorsky's car and approach defendant on the sidewalk. He saw defendant turn around to speak to her. It appeared to him that the pair knew each other. They engaged in conversation underneath the canopy for about two minutes while Burns watched them from a distance of twenty to twenty-five yards. At that time, Burns had a full facial view of defendant.

Burns then observed defendant and Siani walk along the sidewalk and enter the lobby door of the Econo Lodge together. Burns slowly drove through the illuminated carport area and looked through the doors of the Econo Lodge, a distance of eight to ten feet. He observed defendant and Siani walking through the lobby past the registration desk. They were about forty or fifty feet into the lobby. Defendant and Siani then walked into the hallway leading to the guest rooms. After making these observations, Burns drove out of the parking lot to respond to another call.

Crouch did not see defendant enter the lobby of the Econo Lodge with Siani. She saw defendant when she checked him out of the motel less than an hour later, however. Crouch did not notice anything unusual about defendant at that time other than

the smell of soap. They did not engage in any conversation. Defendant simply placed the key to his room on the counter and left the lobby.

A receipt from the Econo Lodge showed a check-out time of 4:03 a.m. Crouch testified that this time was inaccurate, because she was running an audit when defendant checked out and she could not immediately enter the information into her computer. Instead, thirty to forty-five minutes elapsed before she entered the information.

On the night of March 28, into the early morning hours of March 29, Melodie Hall, an employee of Parry Transportation, was driving a tractor-trailer to Levittown, Pennsylvania. According to a toll receipt and a surveillance video tape, she entered Interchange 29 of the Pennsylvania Turnpike in Bristol at 3:13 a.m. on March 29, 2000. As she approached the tollbooth, Hall noticed a red, open-bed pick-up truck driving towards the Turnpike. A person was lying in the back towards the tailgate. Hall could not tell whether that person was a male or a female or whether the body was moving. The torso appeared to be covered with a white drop cloth, and was wearing white socks and dark pants. Hall had an unobstructed view of the back of the pick-up truck for a few seconds when it stopped at the tollbooth and she came to within eight feet of it. Hall thought that the person lying in the back of the pick-up truck may have had too much to drink, and she did not report her observation to the toll collector or to the police.

Hall only caught a glimpse in the mirror of the driver of the red pick-up truck and therefore was not able to identify that person. From her view in the side-view mirror, Hall thought the driver was a male because of the shape of the shoulders. He was wearing a dark jacket and had smooth, slicked back dark hair that appeared to have just been washed.

Dale Hartranft had stayed in room 123 on the first floor of the Econo Lodge from March 27 through March 30. On either Tuesday night or Wednesday night of that week, he was awakened

at some point between midnight and 3:00 a.m. by a very loud thud or thump. He took no action regarding the disturbance and fell back asleep. He could not tell where the noise had come from.

When he left for work either that morning or one of the following mornings that week at 5:45 a.m., Hartranft found a set of keys on the ground alongside the driver's door of his truck, which was parked near the door to his room. It was still dark outside. Hartranft turned the keys over to Crouch at the front desk. Yavorsky subsequently identified those keys as the ones Siani had had in her possession while sitting with Yavorsky in her car in the early morning hours of March 29.

In the days following March 29, Siani's car remained in the same parking space in Diva's lot. On Thursday night, March 30, Siani did not report for work at Diva's. She also did not show up for a bachelor party in Atlantic City on Friday at which she had been scheduled to dance. Nor did she report for work at Diva's on Saturday.

On Friday, March 31, Siani's father noticed that Siani had not picked up one or two days' worth of mail which had accumulated in her parents' house in Penndel, Pennsylvania. Although Siani lived at home with her parents, she often stayed with friends. She would stop by her parents' house to pick up her mail, however.

On Saturday morning, April 1, 2000, Richard Scott was riding his four-wheeler in Burlington Township, New Jersey, under the bridge connecting the New Jersey Turnpike and the Pennsylvania Turnpike. He noticed the body of a woman, later identified as Siani, in the grass, and yelled to her. There was no response. He then drove to the Florence Police Station to report his observation. He returned to the scene to point out the location of the body to a Burlington Township police officer who met him there.

When detective John Villamil of the New Jersey State Police arrived at the scene, he saw the body directly below the edge of the bridge in a grassy area about fifty yards from River Road.

Siani was wearing blue jeans, a white sweater with a multi-colored pattern, and white socks. The socks contained little or no dirt and no shoes were found. The sweater she was wearing was the same one depicted in the photograph Yavorsky had taken while she and Siani were sitting in Yavorsky's car. There were no tire tracks or drag marks near the body.

Detective John Garkowski, also of the New Jersey State Police, noticed that Siani was positioned on her side with her chest to the ground. Rivulets of blood had come out of her left ear. A large amount of dried blood was caked on her left temple and some blood splatters were on the left side of her face. Garkowski testified that indentations on the ground adjacent to Siani's body were consistent with an impact site, possibly from the victim falling from the bridge.

Garkowski and Villamil went to the upper bridge deck and noticed a blood stain on the side of the retaining wall, almost directly above the body. Garkowski took swabbings from this stain.

Siani was pronounced dead later that afternoon when the Burlington County Medical Examiner arrived on the scene.

On the following day, April 2, at lunchtime, Love heard a news report that the police were requesting the public's assistance in identifying a body found under the Turnpike Bridge. The report described a twenty—to thirty-year old female wearing the same clothes that Love had last seen Siani wearing on her return to Diva's at about 1:30 a.m. on March 29. The report also described a butterfly necklace that Love knew Siani wore. He notified the police that the unidentified female might be Siani. A fingerprint check confirmed her identity.

Later that same afternoon, Detective Victor Tunis of the Bristol Township Police Department responded to Diva's and located Siani's car, still parked in the lot. Tunis inventoried its contents at the Bristol Township police garage. He found Siani's purse, a styrofoam container of noodles, several cigarettes that appeared to

be marijuana joints, rolling papers, Prozac, and other personal effects.

On the following morning, April 3, Patrolman Burns was called to headquarters and informed of the homicide investigation. He met with Sergeant McNally of the New Jersey State Police. McNally told Burns that he was going to show him a photograph to determine whether Burns could identify the person depicted as the man he saw outside of Diva's and the Econo Lodge in the early morning hours of March 29. Burns identified defendant's photograph as depicting the man he had seen. Burns was aware from viewing the photograph that defendant had previously been arrested since it was a "booking" or arrest photograph that showed both a front view and a profile view of defendant, with a serial number and "Pennsylvania State Police" marked on the front. The back of the photograph, which was not shown to Burns, contained the date of September 29, 1999, defendant's name, a trooper's name, and a recited offense, driving under the influence. Burns testified at trial that he had based his identification of the photograph upon defendant's facial features, hair style and skin tone. Also, while conferring with McNally, Burns identified a photograph of Siani as the female he had observed entering the lobby of the Econo Lodge with defendant on the morning in question.

On that same day, April 3, Burns wrote a report recording his observations of defendant and Siani in the parking lot and lobby of the Econo Lodge in the early morning hours of March 29. He described the man he saw as being six feet tall and as weighing between 220 and 240 pounds. Viewing defendant at trial, Burns acknowledged that defendant was only about 5'8" or 5'9" tall and that he weighed between 185 and 195 pounds.

On the afternoon of April 3, Detectives Tunis and Villamil went to the Econo Lodge to secure room 223, which had been rented to defendant on the night of March 28–29. Upon leaving the Econo Lodge, Tunis and Villamil noticed a large blood stain about thirty inches long and five inches wide on the sidewalk next to a drain in

front of room 122 and directly underneath the window of room 223. Tunis took swabbings from that stain.

The window in room 223 could be slid open. There was a ledge, thirty inches wide, about three feet below this window, and then a distance of nine feet between the ledge and the ground.

On April 5, Detective Garkowski examined defendant's red pick-up truck, which had been seized pursuant to a search warrant. He removed a rear license plate frame that had "rivulets of blood dripping from the top portion down underneath." Garkowski also removed the plastic liner from the bed of the truck. The liner had two weep holes. He found several blood stains on the metal bed of the truck and on the underside of the bed liner. Garkowski theorized that the blood was transferred under the liner through the weep holes when the truck was washed. He collected samples of these stains.

Subsequent tests performed at the New Jersey State Police Laboratory disclosed that the stain on the side of the retaining wall of the bridge above the location of Siani's body was human blood. The source of this blood could not be identified, however, because the DNA in the sample failed to amplify by reason of exposure to the environment. DNA tests performed on samples from two of the blood stains found underneath the bed liner of defendant's pick-up truck revealed them to have come from Siani. DNA tests performed on two samples taken from the blood stain found on the sidewalk next to the drain underneath the motel room window also confirmed Siani as the source. None of the samples analyzed contained defendant's DNA. There was no evidence from specimens collected during Siani's autopsy that she had been sexually assaulted.

Trooper Geoffrey Noble of the New Jersey State Police located the turnpike surveillance videotape from March 29, which showed a red Dodge pick-up truck with what appeared to be a body in the rear going through Interchange 29 (Bristol) of the Pennsylvania Turnpike at 3:13 a.m. Noble also located a surveillance videotape which showed the red Dodge pick-up truck absent the body in the

rear driving through Interchange 6 (Florence) of the New Jersey Turnpike at 3:31 a.m. on March 29. Another tape showed the red pick-up truck exiting the Pennsylvania Turnpike at Interchange 29 at 3:40 a.m. The license plate number of the pick-up truck and the identity of the driver could not be ascertained from these tapes. The videotapes were received in evidence and played for the jury. Further investigation of Pennsylvania and New Jersey Turnpike toll tickets disclosed vehicular movement that could have been defendant's pickup truck between the two states over the bridge connecting the roadways at the times in question.

Based on the investigations, Villamil theorized that after driving through Interchanges 29 and 30 of the Pennsylvania Turnpike, defendant drove onto the New Jersey/Pennsylvania Turnpike Bridge, threw Siani's body off the bridge, continued driving over the bridge, drove up to Interchange 7 of the New Jersey Turnpike where he obtained a toll ticket, drove south on the New Jersey Turnpike to Interchange 6 where he paid his toll, drove back over the New Jersey/Pennsylvania Turnpike Bridge, re-entered the Pennsylvania Turnpike at Interchange 30 and then exited when he reached Interchange 29.

On October 28, 2000, Villamil drove the route of travel in order to determine the distance and length of time involved. He concluded that the total round trip of 21.9 miles took twenty-five minutes without exceeding the speed limit.

An autopsy of Siani's body was conducted on April 2, by Dr. Ragasa, the Burlington County Medical Examiner. He found that she had sustained a comminuted fracture of the left parietal temporal region, a small fracture of the right parietal temporal region, a hinge fracture at the base of her skull, a fractured left mandible, two fractured cervical vertebrae, a fractured thyroid cartilage, and conjunctival and right facial contusions with petechiae. Ragasa ruled Siani's death a homicide. In his opinion, the cause of death was multiple injuries secondary to falls. He found no signs of strangulation. Siani's neck showed no indications of

trauma or hemorrhaging around the larynx, thyroid gland, tongue, epiglottis, or vocal cords.

Dr. Braswell, another medical examiner, reexamined Siani's body on April 7, and found that she had been strangled.

Dr. Faruk Presswalla, the New Jersey State Medical Examiner, performed a third examination of Siani's body on April 7. Before his examination, Presswalla reviewed the results of Ragasa's prior autopsy and whatever information was available about the scene. Following his examination, Presswalla visited the location where Siani's body had been found, as well as the Econo Lodge.

Upon examining Siani's body, Presswalla first noticed that she had sustained petechiae—pinhead sized hemorrhages—in both eyes, underneath her eyelids, and on the facial skin, especially on the right side of her face. According to him, this was a sign of mechanical asphyxia. When pressure is applied to the neck, the capillaries will eventually rupture, causing tiny hemorrhages. The mechanical asphyxia could have been caused by squeezing Siani's neck manually or by a choke hold with a forearm around the neck. In Presswalla's opinion, the mechanical asphyxia caused Siani to pass out but it did not cause her death.

Presswalla's examination also disclosed that Siani had sustained a contusion or bruise on her scalp in the left temporal parietal area, *i.e.,* behind the ear. The bruise had tiny areas of abrasion on its surface, which indicated a forcible impact with a flat, rough surface such as the sidewalk outside the Econo Lodge motel.

Underlying this scalp injury on the left side was a comminuted fracture, *i.e.,* the skull was broken into multiple pieces, likely caused by a fall from the motel window. The right side of the skull had a smaller fracture with much less bruising and hemorrhage. In Presswalla's opinion, the right-sided injury produced less bruising because it occurred after the left-sided injury and at a time when Siani had very minimal blood pressure. The fracture to the right side of Siani's skull, he opined, may have been caused by her fall from the Turnpike Bridge.

Presswalla also found a hinge fracture at the base of Siani's skull, *i.e.*, her skull was fractured almost from ear to ear allowing the front part of her skull to be separated from the back part. In his opinion, this very severe and extensive fracture was caused by Siani's fall from the window of the Econo Lodge. The large pool of blood on the sidewalk was typical of the kind of bleeding from the head and ears that occurs with a basal skull fracture.

In addition, Presswalla's examination revealed a fracture of the left side of Siani's mandible or lower jaw. Also fractured were the tibia and fibula in Siani's leg, most of her ribs, her shoulder blade, and the left side of her pelvis. Extensive hemorrhaging had occurred over the front of the chest in the breastbone area, along the spine and in the abdominal area.

Presswalla also discovered that Siani's right kidney was lacerated and that her liver was torn into multiple pieces, with the underside of the liver "totally pulpified." The peritoneum, the membrane lining the abdominal cavity housing several organs including the liver, contained about 400 cubic centimeters of blood.

In Presswalla's opinion, the lacerations to Siani's liver were caused by a large force impact on the abdomen. Based on his observations of the scene, Presswalla concluded that it was "unlikely" that a fall from the second floor window of the Econo Lodge would have generated sufficient force to cause the lacerations to Siani's liver. These lacerations were consistent with a fall from the height of the New Jersey/Pennsylvania Turnpike Bridge, however.

In Presswalla's opinion, Siani's death was a homicide. She sustained a near fatal head injury from her fall out the window of the Econo Lodge and her liver injury was caused by her fall from the bridge. She died as a result of the combination of both these injuries.

Although conceding that Siani could have died from the injuries she sustained in her fall out the motel window, Presswalla opined that she was still alive at the time she was thrown off the bridge.

He explained that if Siani had been dead at the time of her fall from the bridge, her liver lacerations would not have produced 400 cubic centimeters of blood in her peritoneal cavity. Although liver lacerations in a dead person would produce some bleeding, it would not amount to more than about 100 cubic centimeters of blood. This is because a dead person does not have any blood pressure. Thus, Siani still had to have had a low level of blood pressure when she struck the ground and her liver was lacerated. Neither Presswalla nor Ragasa had made a determination as to the time of Siani's death.

Defendant did not testify at trial. He introduced no expert testimony. He called eleven lay witnesses some of whom testified concerning his reputation for truth and honesty and others on issues of habit and custom. One of these witnesses, Douglas Bowker, a cook at Diva's, testified that, on one occasion, he was ordered by the night manager of Diva's to take defendant's car keys away from him in order to prevent defendant from driving when he had had too much to drink. After obtaining defendant's keys, Bowker gave them to the manager, who placed them in the office safe in an envelope labeled "Jack's keys." All the owners and managers of Diva's had access to this safe.

Defendant's argument to the jury was based, in part, on the theory that someone else had transported Siani in defendant's truck. He argued that the State had established no motive on his part for the crime, and that the evidence implicating him was flawed. He also argued that the conduct attributed to him by the State was out of character and that others with motive and opportunity to commit the crime had not been adequately excluded by the State's proofs.

As emphasized by defendant in his first argument on appeal, the trial judge, in charging the jury, never instructed the panel that the charged crime could not result in a guilty verdict unless the crime had been committed in New Jersey. Because we discern no merit in any of the other issues defendant advances on appeal, the sole remaining question we must decide is whether an

instruction on subject matter jurisdiction was necessary in the circumstances presented, notwithstanding that defendant had presented no proofs or argument regarding the locus of the crime, had not requested a charge on the subject, and had not raised the issue of jurisdiction for the trial court to consider.

Defendant now asserts there was a factual issue as to whether the victim's death occurred in New Jersey or Pennsylvania. In evaluating the arguments presented in this connection, we are governed by plain error criteria. *See R.* 2:10–2.

■ Defendant did not object at trial to the jurisdiction of the New Jersey courts to try him on the charge of murder, and he did not request a jury charge on the element of jurisdiction. Nevertheless, the territorial jurisdiction of this State's courts to convict a person of an alleged offense cannot be waived and may be raised at any time. *See R.* 3:10–2(e); *State v. Streater,* 233 *N.J.Super.* 537, 541, 559 *A.*2d 473, 475 (App.Div.), *certif. denied,* 117 *N.J.* 667, 569 *A.*2d 1358 (1989). The failure to charge the jury properly on jurisdiction when there is a factual issue with respect to that element must, on appeal, be recognized as plain error. *See State v. Bragg,* 295 *N.J.Super.* 459, 466, 685 *A.*2d 488, 491–92 (App.Div. 1996).

■ Territorial jurisdiction is an element of every criminal offense. *See N.J.S.A.* 2C:1–14h(e); *N.J.S.A.* 2C:1–3e; *State v. Casilla,* 362 *N.J.Super.* 554, 561, 829 *A.*2d 1095, 1099 (App.Div.), *certif. denied,* 178 *N.J.* 251, 837 *A.*2d 1093 (2003). "The Constitution [of the United States] gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." *United States v. Gaudin,* 515 *U.S.* 506, 522–23, 115 *S.Ct.* 2310, 2320, 132 *L.Ed.*2d 444, 458 (1995). *See also N.J.S.A.* 2C:1–13(a) ("No person may be convicted of an offense unless each element of such offense is proved beyond a reasonable doubt."). Because there is generally no dispute concerning territorial jurisdiction, a trial judge is required to instruct the jury regarding this element "only if there is an issue regarding the relevant facts." *State v. Casilla, supra,*

362 *N.J.Super.* at 561–62, 829 *A.*2d at 1099. When there exists a factual issue with respect to the jurisdictional facts, the jury plays a critical role. *State v. Schumann,* 111 *N.J.* 470, 475, 545 *A.*2d 168, 171 (1988); *State v. Bragg, supra,* 295 *N.J.Super.* at 466, 685 *A.*2d at 491–92.

█ Under *N.J.S.A.* 2C:1–3a(1), New Jersey has territorial jurisdiction if "[e]ither the conduct which is an element of the offense or the result which is such an element occurs within this State[;]" When, as here, "the offense is homicide, either the death of the victim or the bodily impact causing death constitutes a 'result,' within the meaning of subsection a.(1) and if the body of a homicide victim is found within the State, it may be inferred that such result occurred within the State." *N.J.S.A.* 2C:1–3d. Of course, an inference is merely a permissive deduction which the jury may, but need not, entertain. *State v. Humphrey,* 183 *N.J.Super.* 580, 584, 444 *A.*2d 1135, 1137 (Law Div.1982), *aff'd,* 209 *N.J.Super.* 152, 507 *A.*2d 241 (App.Div.1986).

The State asserts in its brief that the judge was not required to instruct the jury on the element of jurisdiction because there was no factual dispute regarding the cause, manner or place of Siani's death. Yet, even though Siani's body was undeniably found in New Jersey, that fact merely raised an inference, which the jury was not required to accept, that Siani had either died in New Jersey or that the bodily impact causing her death occurred in this State. *N.J.S.A.* 2C:1–3d. The only evidence produced by the State suggesting that the final bodily impact causing Siani's death occurred in New Jersey came into the record through the testimony of Dr. Presswalla. It bears repeating that, although Presswalla acknowledged that Siani could have died from the head injury she sustained in her fall out of the motel window in Pennsylvania, he opined that she was still alive at the time she was thrown off the bridge in New Jersey. As we have already noted, he also opined that, if Siani had been dead at the time of her fall from the bridge, her liver lacerations would not have produced 400 cubic centimeters of blood in her peritoneal cavity; and that, although

liver lacerations in a dead person would produce some bleeding, it would not amount to more than about 100 cubic centimeters of blood.

In sum, Presswalla based his opinion that Siani had died after she was thrown off the bridge in New Jersey on the assumption that her fatal liver injury was caused by the fall off the bridge. Yet, Presswalla was not certain that Siani's fall from the second floor window of the Econo Lodge in Pennsylvania did not cause the lacerations to her liver. He merely opined that it was "unlikely" that Siani's fall from the motel window would have generated sufficient force to cause the lacerations to her liver. If the fall from the motel window in Pennsylvania caused her liver lacerations, Siani could have lived for a sufficient time after this fall to allow 400 cubic centimeters of blood to accumulate in her peritoneal cavity and yet have died prior to her body being transported to New Jersey.

Presswalla's testimony on the critical issue was, thus, equivocal. Whether it established beyond a reasonable doubt that either Siani's death or the fall which caused her fatal liver injury occurred in New Jersey was within the province of the jury to determine. The panel required guidance via adequate instructions focusing on the critical nature of the question.

Since "the issue of what act took place where is for the jury," Cannel, *New Jersey Criminal Code Annotated*, comment 5 on *N.J.S.A.* 2C:1–3 (2004), and the evidence in this case clearly raised an issue regarding the place of Siani's death and the place where the fatal bodily impact occurred, we conclude that the judge erred in failing to charge the jury on the element of territorial jurisdiction. *See State v. Casilla, supra,* 362 *N.J.Super.* at 561–63, 829 *A.*2d at 1099–1100 (where it was unclear whether the conduct which formed the basis of the defendant's conviction for attempted theft by extortion occurred in New Jersey, the issue of territorial jurisdiction should have been submitted to the jury as an element of the offense and the trial judge's failure to do so constituted reversible error).

The need for the question of territorial jurisdiction to be submitted to the jury, in the context of this case as it was developed for jury consideration, is subsumed in and emphasized by the standard instruction regarding a jury's role in considering and weighing an expert witness's opinions. An essentially correct and complete version of that instruction was delivered to this jury by the trial judge as follows:

> You are not bound by such expert opinion, but you should consider each opinion and give it the weight to which you deem it entitled, whether that be great or slight, or you may reject it. In examining each opinion, you may consider the reasons given for it, if any, and you may also consider the qualifications and credibility of the expert.
>
> It is always within the special function of the jury to determine whether the facts on which the answer or testimony of an expert is based actually exist. The value or weight of the opinion of an expert is dependent upon and is no stronger than the facts on which it is based. In other words, the probative value of the opinion will depend upon whether from all the evidence in the case you find that those facts are true.
>
> You may, in fact, determine from the evidence in the case that the facts that form the basis of the opinion are true, are not true, or are true in part only, and in light of such findings, ... you should decide what effect such determination has upon the weight to be given to the opinion of the expert. Your acceptance or rejection of the expert opinion will depend therefore to some extent on your findings as to the truth of the facts relied upon. The determination of the ultimate guilt or innocence of the defendant is to be made only by the jury.

*See Amaru v. Stratton,* 209 *N.J.Super.* 1, 20, 506 *A.2d* 1225, 1235 (App.Div.1985).

Defendant's rather brief cross-examination of Presswalla dealt primarily with the asphyxiation elements of that expert's opinion and the fact that Dr. Ragasa, the first medical examiner to inspect the body, had found no signs of strangulation. Counsel also briefly questioned Presswalla on his views concerning the impact injuries to the body. Counsel's summation to the jury focused generally on the weaknesses of the State proofs in connecting defendant to Siani's death, and he made no reference to any questions concerning the locus of the injuries or the death.

Notwithstanding these deficiencies in the defense, the question of where the death—or the injuries that caused it—had occurred was central to the case. No proof was presented that could

connect the asphyxiation with New Jersey. The sole link between Siani's death and this State could exist only if she was alive when thrown over the bridge on the New Jersey side. It was critical, therefore, for the jury to be instructed on the need to make a beyond-a-reasonable-doubt finding in that regard from whatever evidence had been presented.

■ In any jury trial, where the proofs establish the existence of a factual question as to a critical feature of the case—in a criminal prosecution, any element of the crime charged, including territorial jurisdiction—the jury must be adequately instructed as to that aspect even where no countervailing evidence has been introduced. This principle is well established in our jurisprudence, especially with respect to expert testimony. It springs from the idea, applied to criminal cases as well as civil cases, *see State v. Scelfo,* 58 *N.J.Super.* 472, 477–78, 156 *A.*2d 714, 716 (App.Div.1959), *certif. denied,* 31 *N.J.* 555, 158 *A.*2d 454 (1960), that the finder of fact is free to accept or reject expert testimony going to a critical fact. There is "[n]othing in [the] decisions [addressing the subject] indicat[ing] that undisputed expert testimony removes the question from the province of the jury." *Domurat v. Ciba Specialty Chemicals,* 353 *N.J.Super.* 74, 90, 801 *A.*2d 423, 433 (App.Div.2002) (citing *Waterson v. General Motors Corp.,* 111 *N.J.* 238, 248–49, 544 *A.*2d 357, 362 (1988) (quoting *Amaru v. Stratton, supra,* 209 *N.J.Super.* at 20, 506 *A.*2d at 1235 ("A jury has no duty to give controlling effect to any or all of the testimony provided by the parties' experts, even in the absence of evidence to the contrary."))). *See also Ferdinand v. Agricultural Ins. Co.,* 22 *N.J.* 482, 494, 126 *A.*2d 323, 329–30 (1956); *Poliseno v. General Motors Corp.,* 328 *N.J.Super.* 41, 59, 744 *A.*2d 679, 689 (App.Div.), *certif. denied,* 165 *N.J.* 138, 754 *A.*2d 1213 (2000); *Ardis v. Reed,* 86 *N.J.Super.* 323, 330, 206 *A.*2d 890, 893–94 (App.Div.), *aff'd o.b.,* 46 *N.J.* 1, 214 *A.*2d 313 (1965).

■ A corollary of the axiom is the requirement that the trial judge must "relate[ ] the law he [is] charging to the facts the jury [is] being asked to decide." *State v. Medina,* 254 *N.J.Super.* 668,

685, 604 *A.*2d 197, 206 (App.Div.1992) (citing *State v. Concepcion,* 111 *N.J.* 373, 379, 545 *A.*2d 119, 122 (1988) (the judge should "mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case")). *See also Das v. Thani,* 171 *N.J.* 518, 527, 795 *A.*2d 876, 882 (2002); *State v. Afanador,* 151 *N.J.* 41, 54, 697 *A.*2d 529, 535 (1997) ("Erroneous instructions are poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error.").

The trial court's omission to deliver the necessary instruction regarding territorial jurisdiction along with adequate reference to the proofs deprived defendant of a properly instructed jury's verdict that took into account each and every element of the crime charged. Accordingly, the guilty verdict was flawed in a basic way and the matter must be retried to correct the fundamental deficiency.

Reversed and remanded.