898 A.2d 523

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
JOHN A. DENOFA, DEFENDANT–RESPONDENT.

Argued January 17, 2006—Decided June 5, 2006.

*Frank Muroski,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Stephen A. Caruso,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice ALBIN delivered the opinion of the Court.

Defendant John A. Denofa was convicted by a jury of murder. The Appellate Division overturned the conviction because the trial

court did not require a jury finding that the crime was committed in New Jersey. In this appeal, we must determine whether territorial jurisdiction is an element of the crime of murder and must be charged to the jury, even absent a request by defendant. Additionally, we must decide whether there is sufficient evidence in the record to support a finding that defendant murdered the victim in this State. We now hold that territorial jurisdiction is an offense element and must be decided by the jury, even without a request from the defendant, provided the record clearly indicates a factual dispute concerning where the crime occurred. In this case, defendant did not request a territorial jurisdiction charge, the trial evidence did not clearly indicate that the location of the murder was at issue, and there was sufficient evidence to support the conclusion that the crime was committed in New Jersey. We therefore reverse the Appellate Division and reinstate defendant's conviction.

## I.

### A.

On April 1, 2000, the badly battered and lifeless body of twenty-one-year-old Rachel Siani was found lying face down underneath the Delaware River Turnpike Bridge in Burlington Township, New Jersey, approximately fifty yards from the edge of the Delaware River.[1] She was fully clothed, wearing a sweater, blue jeans, and socks. The blood on the bridge's retaining wall, an indentation on the ground directly beneath Rachel's body, and the lack of tire tracks or drag marks in the area strongly suggested that she had either fallen or was thrown from the bridge to her death.

Rachel was last seen talking with defendant in the parking lot of Diva's International Gentlemen's Club, located in Levittown,

---

[1] The following factual presentation is based on the testimony and evidence introduced at defendant's murder trial.

Pennsylvania, in the early morning hours of March 29, 2000. At the time, Rachel, a Bucks County Community College student, worked as an exotic dancer at Diva's and defendant was a regular Tuesday night customer at the club. On Tuesday, March 28, Rachel worked the 4:00 to 10:00 p.m. shift at Diva's. At some point during the evening, defendant and Rachel talked to each other while seated at the bar. Defendant invited Rachel to accompany him to the Sportsters Bar in Falls Township, Pennsylvania, but she declined, explaining that she was too tired. Both left Diva's separately sometime after 10:00 p.m.

At 11:16 p.m., defendant checked into room 223 on the second floor of the Econo Lodge Motel, which is connected to Diva's. On the registration card, defendant listed his vehicle as a red Dodge truck with Pennsylvania license plate number YR08859.[2] Shortly after checking in, defendant took a taxicab alone to the Sportsters Bar, where he met a friend, who drove him back to the Econo Lodge between 2:00 and 2:15 a.m.

Around that same time, Rachel returned to Diva's. At about 2:30 a.m., she and her friend Rebecca Yavorsky left the club and entered Yavorsky's car in the parking lot. There they remained for about half an hour, talking and smoking marijuana. When a police vehicle pulled into the lot, Yavorsky decided it was best to leave and pulled next to Rachel's car to drop her off. At that moment, Rachel saw defendant leaning against the front door of Diva's and told Yavorsky, "Oh, I'm going to say hi to Jack real fast." When Yavorsky offered to wait, Rachel assured her that "[t]here's nothing to worry about." Yavorsky then left. The police officer patrolling the lot saw defendant and Rachel enter the interior lobby of the Econo Lodge. Rachel was never seen alive again.

The State's theory of the events leading to Rachel's death was pieced together from circumstantial and forensic evidence. That evidence led the State to the following conclusions. Rachel fell

---

[2] Defendant owned the pickup truck listed on the card.

from the second floor balcony of defendant's motel room to the ground twelve feet below. Afterwards, defendant transported Rachel, who was critically injured but still alive, in the bed of his pickup truck to the Delaware River Turnpike Bridge, from which he threw her 112 feet to her death.

The first support for that theory was the recollection of the Econo Lodge's night clerk that defendant smelled of soap when he checked out sometime shortly after 3:00 a.m.[3] At 3:13 a.m., a tractor-trailer driver observed a red pickup truck similar to the one owned by defendant at the Interchange 29 tollbooth of the Pennsylvania Turnpike, traveling in the direction of the Delaware River Turnpike Bridge. It takes just several minutes to drive from the Econo Lodge to Interchange 29 and only another minute-and-a-half to drive from there to the bridge where Rachel's body was found. The tractor-trailer driver also noticed a person lying in the open bed of the pickup truck, partially covered by a white drop cloth and wearing white socks and dark pants.

The Interchange 29 toll records and videotape corroborated those observations. A toll ticket was dispensed at 3:13 a.m. to a two-axle vehicle and an Interchange videotape taken at that time showed a human body in the back of a red Dodge pickup truck. A videotape of Interchange 29 taken at 3:40 a.m. showed the same red Dodge pickup truck passing through, this time without a body in the bed of the truck.[4]

The twenty-seven-minute interval between the red pickup truck's two appearances at Pennsylvania Turnpike Interchange 29 was accounted for by additional circumstantial evidence. At approximately 3:30 a.m., a videotape at Interchange 6 of the New

---

[3] The Econo Lodge's registration slip recorded defendant's check-out time as 4:03 a.m. The desk clerk, however, testified that because she was conducting "the night audit," she delayed recording the check-out time. According to the clerk, the actual check-out time was thirty to forty-five minutes earlier than 4:03 a.m.

[4] A New Jersey State Trooper reviewing the videotapes could not identify the driver of the red pickup truck.

Jersey Turnpike captured a red Dodge pickup truck exiting the Turnpike. The corresponding toll ticket indicated that the truck had traveled the stretch of the Turnpike between Interchanges 6 and 7.

Based on the toll records and the videotapes, a New Jersey State Police detective offered his opinion of the route taken by defendant in his red pickup truck in the early morning hours of March 29: (1) defendant went through the toll at Pennsylvania Turnpike Interchange 29; (2) he then traveled to the Delaware River Turnpike Bridge from which he dropped Rachel's body; (3) he continued over the bridge to Route 130, entering the New Jersey Turnpike at Interchange 7 and exiting at Interchange 6; (4) he finally returned to Pennsylvania, crossing the bridge, and passed through Pennsylvania Turnpike Interchange 29.

Forensic and testimonial evidence supported the State's theory that Rachel fell or was thrown from the balcony of defendant's motel room and then placed in defendant's pickup truck. Rachel's DNA matched both a thirty-by-five-inch blood stain found on the sidewalk directly beneath defendant's motel room and blood found in the back of defendant's truck. Additionally, a guest in the motel room below defendant's recalled hearing a loud thump sometime between midnight and 3:00 a.m. The guest later discovered a set of keys identified as Rachel's in the parking lot.

Dr. Faruk Presswalla, the New Jersey State Medical Examiner, conducted an autopsy of Rachel and classified her death as a homicide "caused by the agency of another human being." He concluded that Rachel was still alive when thrown to her death from the Delaware River Turnpike Bridge. Dr. Presswalla detailed the massive injuries suffered by Rachel and the likely cause of those injuries. He first noted that hemorrhages in Rachel's eyes, eyelids, and face indicated that she had been manually strangled, sufficient to cause her "to pass out, but not to cause [her] death."[5] He also described multiple bone fractures through-

---

[5] Dr. Ragasa, the Burlington County Medical Examiner, performed the first autopsy of Rachel's body and concluded that there were no signs of asphyxiation. Dr. Ragasa did not testify at trial.

out Rachel's body, including fractures to her right lower leg, left and right ribs, shoulder blade, left side of the pelvis, left lower jaw, and skull, accompanied by extensive hemorrhaging. The left side of Rachel's skull was fractured into multiple pieces; the right side had a smaller break and less bruising. In addition, Rachel's liver was lacerated and "totally pulpified," and the peritoneal cavity, in which the liver is encased, contained 400 cubic centimeters (cc) of blood.

Dr. Presswalla explained the significance of those injuries. In his opinion, Rachel fell on her "left side back" from the second floor of the motel and landed face down after falling from the bridge. The extensive lacerations to the liver and the quantity of blood in the peritoneal cavity indicated "a large force impact on the abdomen." Dr. Presswalla maintained that a fall from the motel's second floor balcony would not likely have caused such massive damage to Rachel's liver. On the other hand, he found the liver injuries consistent with a fall from the height of the bridge. He concluded that had Rachel died from the fall from the motel balcony there would not have been 400 cc of blood in her peritoneal cavity for the simple reason that after death there is no blood pressure and therefore no additional bleeding. He also determined that the left-side skull fracture was consistent with a fall from the second floor of the motel based on the sidewalk bloodstain and that the right-side skull fracture, which caused less bruising due to lowered blood pressure, was consistent with a fall from the bridge. Thus, Dr. Presswalla gave his firm opinion that Rachel was still alive when thrown from the bridge.

Defendant did not testify at trial. Through cross-examination of the State's witnesses, he presented the defense that Rachel's killer somehow obtained his truck keys, which occasionally were held by Diva's employees to keep him from driving while intoxicated, and that the killer used his truck to carry out the crime. In short, he claimed that he was not the driver of the pickup truck that evening and not the murderer.

The Burlington County Grand Jury returned an indictment, charging defendant with the murder of Rachel Siani in violation of *N.J.S.A.* 2C:11–3(a)(1), (2). The indictment alleged that the crime was committed "on or about March 29, 2000 in Burlington Twp. in Burlington County, and within the jurisdiction of this Court." Defendant never moved to dismiss that indictment on the ground that the grand jury lacked territorial jurisdiction to return the charge. Neither before nor during his jury trial in October and November 2002, did defendant request that the court instruct the jury that territorial jurisdiction is an element of murder and that the State therefore was required to prove beyond a reasonable doubt that the crime was committed in New Jersey. The court, moreover, did not on its own charge the jury that the prosecution had to prove that the murder was committed within the State. Defendant was found guilty of murder and sentenced to a life term subject to a thirty-year period of parole ineligibility.

## B.

On appeal, defendant for the first time argued that because a factual dispute existed concerning whether Rachel died in New Jersey or Pennsylvania, he was entitled to have the issue decided by the jury. Defendant reasoned that territorial jurisdiction is an essential element that must be proven to support a criminal conviction. The Appellate Division agreed and reversed defendant's conviction. *State v. Denofa,* 375 *N.J.Super.* 373, 396, 867 *A.*2d 1247 (App.Div.2005). The panel held that the trial court committed plain error by failing to charge the jury on territorial jurisdiction. *Id.* at 377, 867 *A.*2d 1247. Because territorial jurisdiction is an offense element, the panel explained, "the jury plays a critical role" in resolving any factual dispute regarding jurisdiction. *Id.* at 392, 395, 867 *A.*2d 1247. The panel asserted that if the State's "proofs establish[ed] the existence of a factual question" concerning territorial jurisdiction, the jury must be instructed on the subject even if "no countervailing evidence has been introduced." *Id.* at 395, 867 *A.*2d 1247.

In examining the evidence, the panel found Dr. Presswalla's testimony to be "equivocal," noting that the medical examiner "merely opined that it was 'unlikely' that [Rachel's] fall from the motel window would have generated sufficient force to cause the lacerations to her liver." *Id.* at 393, 867 *A.2d* 1247. According to the panel, "Presswalla was not certain that [Rachel's] fall from the second floor window of the Econo Lodge in Pennsylvania did not cause" the liver injury and accumulation of 400 cc of blood in her peritoneal cavity, and therefore he could not be certain that Rachel did not "die[ ] prior to her body being transported to New Jersey." *See id.* at 392–93, 867 *A.2d* 1247.

Finding that the jury was "free to accept or reject expert testimony going to a critical fact," the panel concluded that the jury should have decided whether Rachel died in Pennsylvania or New Jersey. *Id.* at 393, 395, 867 *A.2d* 1247. Thus, the panel determined that defendant was deprived "of a properly instructed jury's verdict that took into account each and every element of the crime charged." *Id.* at 396, 867 *A.2d* 1247.

We granted the State's petition for certification and denied defendant's cross-petition. 185 *N.J.* 35, 878 *A.2d* 852 (2005).

## II.

The State contends that, in the absence of a request by defendant, the trial court had no affirmative obligation to charge the jury on territorial jurisdiction. Defendant, on the other hand, asserts that because jurisdiction is an element of murder, only the jury can resolve a factual dispute concerning whether the crime was committed in New Jersey. We conclude that territorial jurisdiction is an element of murder and, on defendant's request, must be submitted to the jury if there is a legitimate factual dispute concerning the location of the crime. Without a request, the trial court is required to charge territorial jurisdiction only if the record clearly indicates a factual dispute concerning where the crime occurred.

## A.

We begin with an overview of the doctrine of territorial jurisdiction. Under the New Jersey Code of Criminal Justice, as well as the common law, the State is vested with the power to prosecute and punish crimes that occur only within its territorial borders. *See N.J.S.A.* 2C:1–3(a)(1) ("[A] person may be convicted under the law of this State of an offense committed by his own conduct . . . if . . . [e]ither the conduct which is an element of the offense or the result which is such an element occurs within this State."); *State v. McDowney,* 49 *N.J.* 471, 474, 231 *A.*2d 359 (1967) (asserting that essential basis for invoking "jurisdiction in criminal cases is that the crime be committed in the state in which the case is tried"); 4 Wayne R. LaFave, *Criminal Procedure* § 16.4(c), at 571–72 (2d ed. 1999) (noting that under common law, "a state has power to make conduct or the result of conduct a crime only if the conduct takes place or the result happens within its territorial limits"); Rollin M. Perkins, *The Territorial Principle in Criminal Law,* 22 *Hastings L.J.* 1155, 1165 (1971) (noting that state may not "punish what is done within the exclusive territorial jurisdiction of another state"). Thus, a first principle of any criminal prosecution is that a State must have territorial jurisdiction to enforce the authority of its laws.

The next question is who decides whether the State possesses territorial jurisdiction to pursue a criminal prosecution and convict a defendant. The United States Supreme Court has yet to hold that the United States Constitution requires jurisdictional facts to be determined by a jury. *See United States v. Berrigan,* 482 *F.*2d 171, 176 (3d Cir.1973) ("In the federal experience there has never been any constitutional requirement that the jury find facts other than those relating to the issue of guilt or innocence."). In the absence of a federal constitutional mandate, a number of courts have determined that jurisdiction is a question to be decided by the judge and not the jury. *See, e.g., People v. Betts,* 34 *Cal.*4th 1039, 23 *Cal.Rptr.*3d 138, 103 *P.*3d 883, 892 ("Because territorial jurisdiction is a procedural matter that relates to the authority of

California courts to adjudicate the case and not to the guilt of the accused or the limit of authorized punishment, a jury trial on the factual questions that establish jurisdiction is not required by the federal Constitution."), *cert. denied,* —— *U.S.* ——, 125 *S.Ct.* 2949, 162 *L.Ed.*2d 876 (2005); *State v. Beverly,* 224 *Conn.* 372, 618 *A.*2d 1335, 1338 (1993) ("[T]he question of where a murder occurred generally is not an element of the offense, but is merely an issue of territorial jurisdiction to be decided by the court."); *Mitchell v. United States,* 569 *A.*2d 177, 180 (D.C.) ("The question of where an offense took place is not one of fact for the jury." (internal quotation marks omitted)), *cert. denied,* 498 *U.S.* 986, 111 *S.Ct.* 521, 112 *L.Ed.*2d 532 (1990).

On the other hand, courts from states that have adopted the Model Penal Code define territorial jurisdiction as an element of the offense that, when contested, must be found beyond a reasonable doubt by a jury. *See, e.g., State v. Willoughby,* 181 *Ariz.* 530, 892 *P.*2d 1319, 1327 (1995) (en banc) (holding that in cases "in which jurisdiction is legitimately in issue because of contradicting jurisdictional facts, Arizona's territorial jurisdiction must be established beyond a reasonable doubt by the jury"), *cert. denied,* 516 *U.S.* 1054, 116 *S.Ct.* 725, 133 *L.Ed.*2d 677 (1996); *McKinney v. State,* 553 *N.E.*2d 860, 863–64 (Ind.Ct.App.1990) ("Because the prosecution must prove territorial jurisdiction, the issue must be submitted to the jury unless the court determines no reasonable jury could fail to find territorial jurisdiction beyond a reasonable doubt."); *State v. Collin,* 687 *A.*2d 962, 964 (Me.1997) ("Territorial jurisdiction should be decided by the jury when there is a question of fact regarding where the crime occurred, but can be determined by the court when the determination does not require resolution of a factual dispute."); *People v. McLaughlin,* 80 *N.Y.*2d 466, 591 *N.Y.S.*2d 966, 606 *N.E.*2d 1357, 1360 (1992) ("If State territorial jurisdiction is put in issue during . . . trial, the trial court should charge the jury that jurisdiction must be proven beyond a reasonable doubt."); *Commonwealth v. Duden,* 326 *Pa.Super.* 73, 473 *A.*2d 614, 621 (1984) ("[I]n those infrequent cases where jurisdiction depends upon the resolution of disputed facts, it is within the

province of the jury to resolve the issue under proper instructions
. . . ." (internal quotation marks omitted)).

■ New Jersey's Code of Criminal Justice, which is patterned
after the Model Penal Code, makes territorial jurisdiction an
element of the offense that, when factually disputed, must be
decided by a jury. *State v. Schumann*, 111 *N.J.* 470, 474–75, 545
*A.*2d 168 (1988) (per curiam). That conclusion follows not only
from a textual and historical analysis of our Code, but also from
our case law.

Under the Code of Criminal Justice, territorial jurisdiction is
classified as an element of an offense. *N.J.S.A.* 2C:1–14(h) (" 'Ele-
ment of an offense' means (1) such conduct or (2) such attendant
circumstances or (3) such a result of conduct as . . . [e]stablishes
jurisdiction or venue.").[6] As such, when in dispute, territorial
jurisdiction, like every other element, must be "proved beyond a
reasonable doubt." *N.J.S.A.* 2C:1–13(a). In addition, we reaffirm
that, like every element of a crime, territorial jurisdiction (when at
issue) must be decided by the jury. *Schumann, supra,* 111 *N.J.*
at 474–75, 545 *A.*2d 168; *see also State v. Anderson*, 127 *N.J.* 191,
208–09, 603 *A.*2d 928 (1992).

The drafters of the Code of Criminal Justice envisioned that
disputed facts concerning territorial jurisdiction would be decided
by the jury. *See* 2 *Final Report of the New Jersey Criminal Law
Revision Commission,* commentary to § 2C:1–12, at 35 (1971).
The New Jersey Criminal Law Revision Commission, which sub-
mitted the proposed Code to the Legislature,[7] apparently, did not

---

6 The "jurisdiction" referred to in *N.J.S.A.* 2C:1–14(h) is territorial jurisdiction.
*State ex rel. G.W.,* 206 *N.J.Super.* 50, 55, 501 A.2d 1012 (App.Div.), *certif. denied,*
102 *N.J.* 355, 508 A.2d 224 (1985); *see also State v. Schumann,* 111 *N.J.* 470,
474, 545 A.2d 168 (1988) (per curiam).

7 Our statutory construction for territorial jurisdiction follows the Model Penal
Code. *Compare N.J.S.A.* 2C:1–3, 2C:1–13, 2C:1–14, *with MPC* §§ 1.03, 1.12,
1.13; *see generally* 2 *Final Report of the New Jersey Criminal Law Revision
Commission,* commentary to § 2C:1–3, at 5–9 (1971). "The Commission's

question that territorial jurisdiction was a decision for the jury; the Commission did question, however, which standard of proof should apply to the jurisdictional issue. *Ibid.* (relying on Model Penal Code commentaries); *see also* Am. Law Inst., *Model Penal Code and Commentaries* § 1.12, at 189–90 (1985). In the end, the Commission chose the beyond a reasonable doubt standard "because of the 'larger difficulty in presenting to a *jury* different standards for appraising different features of the prosecution's case.'" *Ibid.* (quoting *MPC T.D.* 4, p. 109 (1955)) (emphasis added).

The drafters of the Model Penal Code—on which our Criminal Code is patterned—also clearly intended that territorial jurisdiction, when disputed, would be a fact decided by the jury. 2 *Final Report, supra,* commentary to § 2C:1–3, at 5–9 (relying on Model Penal Code commentaries). The Model Penal Code commentaries specified that, in a murder case, the permissive inference of jurisdiction that arises from the presence of a body within a state's borders "does not dispense with a *jury finding* beyond a reasonable doubt of the ultimate jurisdictional fact but it permits such a finding upon proof of the location of the body, and the *jury* is so instructed, unless the court is satisfied that the evidence as a whole clearly negatives the presumed fact." *Model Penal Code and Commentaries, supra,* § 1.03, at 64 (emphasis added).

*State v. Schumann, supra,* follows in the path of the Criminal Law Revision Commission and Model Penal Code Commentaries. In that case, we held that when facts are at issue concerning the State's territorial jurisdiction, those facts must be decided by the jury. 111 *N.J.* at 474–75, 545 *A.*2d 168. We concluded that although the court should define as a matter of law the geographical boundaries of the State's jurisdiction, the jury should determine whether a crime occurred within those boundaries. *Id.* at

commentary, as well as published comment on the *MPC,* may, therefore, assist us in our understanding of the Code." *State v. B.H.,* 183 *N.J.* 171, 188 n. 5, 870 A.2d 273 (2005).

475, 545 A.2d 168. The defendant in *Schumann* took an eleven-year-old boy to Sandy Hook in Monmouth County, where he sexually assaulted him. *Id.* at 473, 545 A.2d 168. "Most of Sandy Hook is subject to concurrent state-federal jurisdiction, but part is subject to exclusive federal jurisdiction." *Ibid.* The State did not have territorial jurisdiction to convict the defendant if the crime occurred solely on federal property. *See id.* at 475, 545 A.2d 168. Because the location of the crime was in dispute, we maintained that the court would decide which areas of Sandy Hook were subject either to concurrent state-federal or exclusive federal jurisdiction and the jury would decide where the assault actually occurred. *Ibid.*

We learn from *Schumann* that disputed facts concerning the location of the crime, and therefore the State's jurisdiction, must be resolved by the jury. *Schumann,* however, did not explain what may appear as obvious—why territorial jurisdiction, unlike other elements of an offense, is submitted to the jury only when there is a factual dispute over the location of the crime.

It is worth noting that the Code distinguishes between elements of an offense, designating some as material and others as non-material. Territorial jurisdiction is designated as a *non-material* element of an offense. *N.J.S.A.* 2C:1–14(i) (" 'Material element of an offense' means an element that does not relate exclusively to the statute of limitations, jurisdiction, venue or to any other matter similarly unconnected with (1) the harm or evil, incident to conduct, sought to be prevented by the law defining the offense, or (2) the existence of a justification or excuse for such conduct[.]"). The material elements of murder that must be proved are that a defendant purposely or knowingly caused death or serious bodily injury resulting in death. *N.J.S.A.* 2C:11–3(a)(1), (2). Those elements go to the essence of whether the defendant committed the crime. No one would question that those elements must be submitted to the jury and decided beyond a reasonable doubt, even without a request by counsel. No conviction could

stand unless a jury affirmatively found each of those elements beyond a reasonable doubt.

However, territorial jurisdiction is a non-material element, and for good reason never submitted to the jury unless there is some factual dispute concerning whether the crime occurred in this State. *State v. Casilla,* 362 *N.J.Super.* 554, 561–62, 829 *A.*2d 1095 (App.Div.) ("[A] trial court is required to instruct the jury regarding this element only if there is an issue regarding the relevant facts."), *certif. denied,* 178 *N.J.* 251, 837 *A.*2d 1093 (2003). It would be pointless to ask the jury to decide whether a murder occurred in the State if no one contests the issue. Typically, there is no dispute regarding the location of the crime.[8] And unlike material elements, territorial jurisdiction does not go to the heart of whether the defendant actually committed the crime.

Having concluded that territorial jurisdiction must be submitted to the jury only when there is a dispute over the crime's location, we now must answer how a court is to determine whether jurisdiction is indeed a disputed fact.

### B.

In setting standards for when the trial court must charge the jury on territorial jurisdiction, we find an apt paradigm in our lesser-included-offense jurisprudence. We have observed that the public interest in a correct verdict requires a trial court to submit to the jury not only those offenses charged in the indictment, but also uncharged lesser-included offenses grounded in the evidence. *See State v. Garron,* 177 *N.J.* 147, 180, 827 *A.*2d 243 (2003) (citing *State v. Powell,* 84 *N.J.* 305, 319, 419 *A.*2d 406 (1980)), *cert. denied,* 540 *U.S.* 1160, 124 *S.Ct.* 1169, 157 *L.Ed.*2d 1204 (2004); *State v. Choice,* 98 *N.J.* 295, 298–99, 486 *A.*2d 833 (1985) (citing *Powell, supra,* 84 *N.J.* at 318, 419 *A.*2d 406). To carry out that mandate,

---

[8] Presumably, the State would have little interest in prosecuting and convicting a person who committed a crime in another jurisdiction.

courts are required to instruct the jury on lesser-included offenses *only* if counsel requests such a charge and there is a rational basis in the record for doing so or, in the absence of a request, if the record clearly indicates a charge is warranted. *Garron, supra,* 177 *N.J.* at 180 n. 5, 827 *A.*2d 243; *Choice, supra,* 98 *N.J.* at 298–99, 486 *A.*2d 833. Thus, when the defendant fails to ask for a charge on lesser-included offenses, the court is not obliged to sift meticulously through the record in search of any combination of facts supporting a lesser-included charge. *State v. Sloane,* 111 *N.J.* 293, 303, 544 *A.*2d 826 (1988); *Choice, supra,* 98 *N.J.* at 299, 486 *A.*2d 833. Only if the record clearly indicates a lesser-included charge—that is, if the evidence is jumping off the page—must the court give the required instruction. *Garron, supra,* 177 *N.J.* at 180, 827 *A.*2d 243; *Choice, supra,* 98 *N.J.* at 299, 486 *A.*2d 833.

We now hold that those standards should apply when trial courts consider whether to charge a jury on territorial jurisdiction. For example, if a defendant requests a charge on territorial jurisdiction and there is some evidence in the record—a rational basis—that would suggest that the crime occurred outside of New Jersey, then the court should give the jury an appropriate instruction. Likewise, if a reasonable doubt about the location of the crime is clearly indicated in the record, then, even in the absence of a request by counsel, the court should instruct the jury on territorial jurisdiction. We hasten to add, however, that the court is not expected to scour the record to find an issue that has not been placed in dispute by the parties.

We take this opportunity to explain how that procedure conforms to *Rule* 3:10–2(e), which addresses the defense of lack of jurisdiction. *Rule* 3:10–2(e) provides: "The court shall notice the defense of lack of jurisdiction in the court at any time during the pendency of the proceeding except during trial." On its face, the rule suggests that territorial jurisdiction is a matter of law to be decided by the court, either before or after trial. Indeed, the comments to the rule state that "[p]aragraph e preserves the

State's right to appeal from a trial court's determination of lack of jurisdiction by precluding the jurisdictional defense from being raised at trial." Pressler, *Current N.J. Court Rules,* comment 5.1 on *R.* 3:10–2 (2006). We do not construe that rule to be in conflict with our holding today or in *Schumann* requiring *the jury* to decide factual disputes regarding territorial jurisdiction. We construe the rule to mean that the court, as a matter of law, may dismiss an indictment for lack of jurisdiction, pre-trial or post-conviction, due to insufficiency of evidence, but may not do so "during trial." Thus, the State has the right to appeal a court's dismissal of an indictment or vacation of a conviction due to lack of jurisdiction. However, factual disputes concerning the existence of an element of an offense, such as territorial jurisdiction, remain the province of the jury.

 For the benefit of our trial courts and the bar, we outline the procedure to be followed when territorial jurisdiction is at issue. Any objection to the State's jurisdiction to prosecute a crime should be raised as early as possible before trial. For instance, shortly after return of an indictment, as part of discovery, the defendant may order a transcript of the grand jury proceedings. *R.* 3:6–6(b). If there are no facts in the record on which a rational trier of fact could conclude beyond a reasonable doubt that the crime was committed within the State, an appropriate motion may be filed. *State v. McDowney,* 49 *N.J.* 471, 475, 231 *A.2d* 359 (1967) ("[A] pre-trial motion to dismiss for lack of jurisdiction ... should be granted only after very careful consideration. The moving party must carry the burden by showing that no inference could reasonably be drawn placing the site of the crime within the State."). If there are facts from which a rational factfinder could come to more than one conclusion concerning the crime's location and the defendant intends to dispute territorial jurisdiction, he should put both the State and the court on notice at the final pretrial conference. Because the validity of any conviction depends on sufficient proof of each element of the offense, lack of territorial jurisdiction may be raised in a motion

for a judgment of acquittal notwithstanding a verdict of guilty. *See R.* 3:18–2.[9]

In any appeal from a conviction in which the defendant did not request a territorial jurisdiction charge, an appellate court first must determine whether the record clearly indicated that the crime's location was at issue. If territorial jurisdiction was not clearly in dispute, then the appellate court must still be satisfied regarding the sufficiency of the evidence. On that issue, the standard of review is "whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find" beyond a reasonable doubt that the crime occurred within the State. *State v. Reyes,* 50 *N.J.* 454, 458–59, 236 *A.*2d 385 (1967) (per curiam).

## C.

In applying those principles to the issues in this case, we conclude that the trial court was not required on its own initiative to charge territorial jurisdiction. We reach that conclusion because there was no factual dispute *clearly indicated* in the record that Rachel Siani died anywhere other than in New Jersey. Giving the State, as we must, the benefit of the most favorable evidence and most favorable inferences drawn from that evidence, we also hold that there is sufficient evidence in the trial record to support a finding that the crime occurred in this State.

Before reviewing the evidence, we take note that in a homicide case "if the body of a homicide victim is found within the State, it may be inferred that [either the death of the victim or the

---

[9] We emphasize that the trial court may not entertain a judgment of acquittal motion on jurisdictional grounds during trial. *See R.* 3:10–2(e) ("The court shall notice the defense of lack of jurisdiction ... except during trial."). The apparent purpose of the rule is to ensure that a legal ruling by the court on jurisdiction is appealable and not barred by principles of double jeopardy.

bodily impact causing death] occurred within the State." *N.J.S.A.* 2C:1–3(d). Thus, without more, the discovery of Rachel Siani's body underneath the Delaware River Turnpike Bridge would have permitted the jury to conclude that she died in New Jersey. Significantly, defendant did not request a jury instruction on territorial jurisdiction. Nor did he offer any evidence to rebut the inference—based on the location of Rachel's body—that either her death or the cause of her death occurred in New Jersey.

In support of the inference that Rachel's death occurred at the Delaware River Turnpike Bridge, the State offered Dr. Presswalla, a medical examiner and expert forensic pathologist. Dr. Presswalla testified that in his opinion Rachel was alive at the time she was thrown from the bridge. Dr. Presswalla formed that opinion because Rachel's liver was "totally pulpified," and only "a large force impact on the abdomen" caused by a fall from the height of the bridge, as opposed to the height of defendant's second floor motel room, could have caused that type of devastating injury and the accumulation of 400 cc of blood in the peritoneal cavity.

We cannot agree with the Appellate Division that Dr. Presswalla's testimony concerning the cause and place of Rachel's death was "equivocal." Medical opinion testimony is not rendered with certainty, but with reasonable certainty. *See, e.g., State v. Fortin,* 178 *N.J.* 540, 597, 843 *A.*2d 974 (2004) ("An expert offering scientific opinion testimony must do so within a reasonable degree of certainty or probability."). In that respect, Dr. Presswalla's testimony met the test. In his own words, responding to questions, Dr. Presswalla left little doubt about where Rachel died.

A: My opinion is that she sustained a near fatal head injury from the fall from the Econo Lodge, but the fall from the bridge produced the liver injury, and she died as a result of the combination of both these injuries.

Q: Well do you have an opinion as to whether or not Rachel Siani was still alive when she went from the top of that bridge to the bottom of the ground in New Jersey?

A: Yes. That is why I'm saying that she died as a combination of both injuries. Had she died—even though that was a serious injury and she could have died from

the injury from the fall at the motel, she wasn't dead at the time that she went over the bridge, and that's why I used the combination—

Q: How do you know that, Doctor? How do you know that she wasn't dead when she went over the bridge, in your opinion?

A: The liver injury that I showed you resulted in 400 cc's of bleeding into the peritoneal cavity. If she was already dead, a liver injury taking place in a dead body, although it would be—may lacerate, will not bleed out beyond maybe about 100 cc's. That is just a little blood that may be there, might ooze out.

Q: Why is that? Just explain that. Why?

A: Because when you're dead, you don't have any blood pressure. It's the blood is under pressure in order to bleed. If it's not under pressure, then if there is blood on the surface where you make a breach, that little blood will just leak out.

Q: So based on the quantity of blood in the peritoneum from the lacerated liver, that's how you conclude that Rachel still had to have blood pressure.

A: Yes.

Nothing in that verbal exchange clearly indicated that territorial jurisdiction was at issue. Moreover, defendant neither cross-examined Dr. Presswalla concerning his opinion on the location of Rachel's death nor introduced expert or lay testimony suggesting that Rachel died in Pennsylvania, before her body was thrown from the bridge. Defendant did not contest the location at which the crime was committed; he simply maintained that he was not the murderer. Under those circumstances, the trial court was not required to comb through the evidence to raise a lack of jurisdiction defense that defendant, apparently, did not consider tenable.

 We are satisfied that the record contains sufficient evidence, particularly when combined with the statutory inference of jurisdiction from the body's location, to support a finding that the crime occurred in New Jersey. When no factual dispute is clearly indicated in the record, the test is not, as stated by the Appellate Division, whether a jury could have formed a reasonable doubt if it disregarded the inference arising from the presence of a body in the State and discounted Dr. Presswalla's testimony; rather, the test is whether based on the inference and the expert testimony there was sufficient evidence in the record to support a finding of jurisdiction.

The present case is unlike *State v. Bragg*, in which the Appellate Division found that the trial court plainly erred in failing to give a charge regarding territorial jurisdiction. 295 *N.J.Super.* 459, 466, 685 *A.2d* 488 (App.Div.1996). In that case, a jury convicted the defendant of criminally restraining his ex-girlfriend and committing an aggravated assault against her. *Id.* at 462–63, 685 *A.2d* 488. Both the defendant and victim testified, giving widely divergent accounts of what happened during the two days in question in June 1993. *Id.* at 462–63, 466, 685 *A.2d* 488. The victim stated that the defendant forced her into his car in Trenton and briefly drove around the city cursing at her and striking her with his fist; then drove her to Morrisville, Pennsylvania, where he dragged her into his apartment, assaulted and threatened to kill her; and the next day, drove her back to New Jersey. *Id.* at 463, 685 *A.2d* 488. The defendant denied the allegations and claimed that the victim willingly accompanied him and engaged in consensual sexual relations with him. *Ibid.*

Even in the absence of a request for a jury instruction on territorial jurisdiction, the appellate panel held that there clearly was a factual dispute concerning where the criminal acts occurred, requiring submission of the issue to the jury. *See id.* at 464, 466, 685 *A.2d* 488. The court reasoned that the conflicting testimony could have led the jury to conclude that both criminal offenses occurred in Pennsylvania, not in New Jersey. *Id.* at 466, 685 *A.2d* 488. Although it did not articulate the standard we have set forth today, the panel, in effect, concluded that the record clearly indicated a factual dispute concerning the location of the crimes. *See ibid.* For that reason, the panel recognized the failure to charge territorial jurisdiction as plain error. *Id.* at 466–67, 685 *A.2d* 488.

In contrast to *Bragg*, here there was no conflicting testimony concerning the location of the crime and the record did not clearly indicate a factual dispute warranting a jury charge on territorial jurisdiction. We repeat that there was sufficient evidence to support a finding of territorial jurisdiction in this case.

## III.

In conclusion, in the absence of a request by defendant for a territorial jurisdiction charge, the trial court is not required to submit the issue of jurisdiction to the jury unless the record clearly indicates that the location of the crime is in dispute. Here, the record does not clearly indicate a jurisdictional dispute and contains sufficient evidence to support a finding that Rachel Siani was murdered in New Jersey. For those reasons, we reverse the Appellate Division and reinstate defendant's murder conviction. We remand to the trial court for the entry of judgment consistent with this opinion.

*For reversal/reinstatement/remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO—7.

*Opposed*—None.