**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5638-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

YOON S. CHOI,

      Defendant-Appellant.

_____

Submitted March 17, 2022 – Decided March 25, 2022

Before Judges Mawla and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 17-05-0264.

Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent (Elizabeth M. Newton, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Yoon Choi appeals from a July 19, 2019 judgment of conviction entered after a jury found him guilty of first-degree murder, N.J.S.A. 2C:11-3(a)(1), third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d), and fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d).  We affirm.

We discern the following facts from the record.  On December 9, 2014, defendant met his former girlfriend, Myung Jeon, in Hamilton Township.  Defendant and Jeon met in Dover Park Plaza and went to Subway.  While at Subway, the pair began to argue because defendant anticipated reconciling, but Jeon instead wished to repay a debt she owed to him.  They argued for roughly forty-five minutes, during which defendant went outside multiple times to smoke cigarettes while Jeon stayed inside.  At one point, Jeon informed defendant that she was living with another man and that she had married him.  Defendant became enraged and stabbed Jeon in the back of her neck with a knife he used to break down boxes for his job at a wine shop.  Jeon fell to the floor in a pool of blood.  Defendant ran out of Subway, dropping the knife in the parking lot.  Three witnesses were present at the time of the incident, and it was captured on surveillance video.  Jeon was severely injured and subsequently transported to the hospital.

A-5638-18

Jeon was admitted to Capital Health Trenton Campus Regional Medical Center, a level two trauma center. She arrived in critical condition and was "quickly deteriorating." She suffered five stab wounds to the neck, one of which cut the spinal cord in half causing paralysis to her right side. The spinal cord injury was irreparable and irreversible. Jeon was brought into surgery that day, and her wounds were closed.

Defendant was interviewed by Detectives Daniel Inman and Kevin Krall at the Hamilton Township Police Station. Before the detectives took a statement from defendant, the following colloquy took place:

> Inman: Before we do anything, we need to make you aware of your rights. Do you read and write English?
>
> Choi: Just a little bit.
>
> Inman: Okay. I can read it for you and you can read along.
>
> Choi: Can I have my telephone to translate, is it possible?
>
> Krall: Do you not understand English to the point where if we read something, you don't think you'll understand it?
>
> Choi: You have the right to remain silent. It means I don't talk.
>
> Inman: Correct.

3

Inman:  Okay.

Choi:  And anything you say can [be] used against you in court.  Okay.

Krall:  Do you understand all that?

Choi: You have the right to talk to [a] lawyer.  I don't have a lawyer right now.

Krall:  Pardon me?

Choi:  I don't have a lawyer right now.

Krall:  But you have the right to have one is what that says.

Choi:  Right okay.  (Inaudible).  If you cannot afford a lawyer, one will be appointed for you.

Inman:  Before any questioning if you wish.  If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer.

Krall:  Do you understand all that, Mr. Choi?

Choi:  Yeah.

. . . .

Inman:  Okay. Now that you signed this you can read this with me.  This reads, I read this statement of my rights and understand what my rights are.  I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been

4

used against me. All that means, Mr. Choi, is I'm not threatening you. If you talk to me, it's going to be voluntarily.

Choi: I cannot understand this, okay, I have read this statement of my rights (inaudible).

Inman: Sir, this is your rights.

Choi: Okay. I understand what my rights are –

Inman: Right

Choi: I'm willing to make a statement and answer questions. Okay. I do not want a lawyer at this time.

Inman: Right. You can stop answering at any time.

Choi: Oh, okay. (Inaudible) know what I'm doing, no promises or threats.

Inman: Or threats.

Choi: Or threats have been made to me and –

Inman: No pressure or coercion of any kind has been used against me. Again, we're not threatening you. If you talk to us, it's going to be voluntarily.

Choi: Okay.

Inman: Okay. Just sign right here if you would, sir. Thank you.

Krall: So you understand you're talking to us because you want to talk to us and explain what happened today, correct?

5

A-5638-18

Choi:  I try my hard but I need the words, the words.

Krall:  Okay, but you understand you don't have to but you want to talk to us.

Choi:  I'll talk.

Krall:  Okay.

After this exchange, defendant told the detectives about his prior relationship with Jeon.  Defendant said he loved her but lamented the fact that she was still talking to another man.  He explained that he lent Jeon $200,000 to show her how much he loved her.  He thought they were going to live together so he did not care if she paid him back, but over time she repaid $160,000.  Defendant said Jeon reached out to him to meet and she tried to give him a $40,000 check post-dated for four years.  Defendant wanted to marry Jeon, but she insisted on writing the check and told defendant she was married.  This made defendant "really, really upset."  When Jeon informed him that she was living with another man and that she had married him, defendant became really angry and upset, and he got the knife and "tr[ied] to hit the neck."  Defendant stated he had not realized what he had done and felt like he was dreaming.  The detectives provided defendant with cigarettes, water, and bathroom breaks.  The detectives did not call the Language Line to seek a Korean speaking officer.

6

Jeon stayed at Capital Health until December 20, 2014, when she was transferred to a level one trauma center in Philadelphia. On July 6, 2016, Jeon died from complications arising from multiple stab wounds to the neck with cervical spinal cord infarction and paraplegia, which lead to pneumonia. An autopsy was conducted on July 14, 2016.

On March 5, 2019, the judge conducted a hearing on defendant's motion to suppress his statements to the police. On March 14, 2019, the judge denied defendant's motion to suppress. Considering "defendant[']s age, education and intelligence, advice as to his constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved," the judge found defendant's "waiver was knowing and intelligent." The judge noted that the detectives inquired about defendant's educational background, that defendant read aloud from the form and summarized his understanding of it, and that his rights were provided both in written form and verbally by the detectives.

The judge then made findings about defendant's statements. Although defendant did state, "I cannot understand this," the judge reasoned "on the transcript [this] may indicate insufficient knowledge but . . . when viewed on the videotape clearly meant that he could not read that whole paragraph as fast

as Detective Inman read it." The judge also found defendant's statement, "I try hard but I need the words" meant he "was referring to the words needed to tell his version of events, not that he could not understand what the detectives were asking him or their explanation of his Miranda[1] rights and whether he wished to waive those rights."

The judge found defendant understood what he was reading because defendant "read the waiver aloud and stated, okay, after each sentence" which indicated "a processing and an understanding of each separate point." The judge found "defendant's command of the English language was sufficient to provide a knowing intelligent waiver" because "defendant's statements throughout the questioning were appropriate and responsive to the specific questions asked." For all those reasons, the judge concluded, "I find the State has met its burden beyond a reasonable doubt and therefore the defendant's statement is admissible."

Defendant's trial took place from March 5, 2019 to April 4, 2019. The State presented testimony from various witnesses including: Shilpa Patel, an employee at Subway; Detective Edward Devine, a crime scene unit detective with the Hamilton police; Wagner Jacome, a UPS driver present at Subway;

---

[1] 384 U.S. 436 (1966).

Adam Noble, a construction worker present at Subway; Detective David Capasso, a crime scene unit detective with the Hamilton police; Kevin Seabridge, a 911 dispatcher; Dr. Michael Kalina, the Medical Director of Acute Care Surgery at Capital Health; Officer Nicholas Gordon, a Hamilton police officer; Detective Kevin Krall, a detective with the Hamilton police; Sergeant Shannon Hoffman, a retired Hamilton police officer; Detective Daniel Inman, a major crimes unit detective with the Hamilton police; Trooper Joseph Walsh, a New Jersey State police officer; Detective David Petelle, a Mercer County Prosecutor's Office detective; Dr. Yuri Rojavin, a trauma surgeon at Capital Health; and Dr. Frederic N. Hellman, the Chief Medical Examiner for Delaware County, Pennsylvania, who testified as an expert in forensic pathology. The State introduced a variety of evidence including the Subway surveillance footage, the 911 call, and the interview with Detectives Inman and Krall. Defendant testified on his own behalf.

Prior to summations, the judge spoke to the attorneys regarding the jury instructions. The State agreed to include aggravated and reckless manslaughter charges. Regarding passion/provocation, the following exchange took place:

> [PROSECUTOR]: Well, I think passion/provocation is clearly out, that you can have—
>
> THE COURT: That is out.

[PROSECUTOR]: – but reckless manslaughter can be in, that's fine.

THE COURT: Okay. So I don't think [defense counsel] has much to say then, right?

[DEFENSE COUNSEL]: Sometimes, Your Honor, for me, and I've learned this, silence is golden.

Accordingly, the judge instructed the jury on the lesser included offenses of aggravated manslaughter and reckless manslaughter and did not include passion/provocation. On April 4, 2019, the jury found defendant guilty on all counts.

On July 12, 2019, the judge held a sentencing hearing. The judge first merged count two into count one. After hearing arguments from the parties, a victim impact letter from the victim's son, and a statement by defendant, the judge applied aggravating factor three (risk that defendant will reoffend) and nine (need to deter) and mitigating factor seven (lack of prior criminal conduct). In detailing her findings of defendant, the judge stated,

> you actually sat there and were critical, not of yourself, you didn't show remorse for the sons who lost their mother. . . .
>
> . . . . I saw you explode on the stand. You cannot control or did not control your anger and your rage. And as you sit here today you are still expressing how angry you are.

A-5638-18

The judge found there was "no change after all the time [defendant] had to reflect, after the jury convicted [him], there was no change in [his] demeanor."

Regarding aggravating factor three, the judge reasoned defendant might reoffend because "if you were to be out and get in another relationship, it could happen again, if you love someone else and they don't love you back." For aggravating factor nine, the judge found the need to deter is "definitely here" and that "there needs to be as much as possible a consequence for [defendant's] actions." Given defendant's lack of criminal history, the judge applied mitigating factor seven, but that was the only mitigating factor the judge found. Ultimately, the judge concluded "that the aggravating factors do substantially outweigh the mitigating factors."

On count one, the judge sentenced defendant to forty-five years' imprisonment with a thirty-eight and a quarter year period of parole ineligibility, followed by five years of parole supervision. On count three, the judge sentenced defendant to a concurrent term of one year. The judge then entered penalties and awarded jail credits.

On July 19, 2019, the judge issued a judgment of conviction reflecting defendant's sentence. This appeal followed.

On appeal, defendant presents the following arguments for our consideration:

POINT I

DEFENDANT'S MOTION TO SUPPRESS HIS STATEMENT TO THE POLICE WAS IMPROPERLY DENIED, AS DEFENDANT DID NOT MAKE A VOLUNTARY, KNOWING, AND INTELLIGENT WAIVER OF HIS FIFTH AMENDMENT RIGHTS.

POINT II

THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY AS TO THE LESSER INCLUDED OFFENSE OF PASSION/PROVOCATION MANSLAUGHTER WAS PLAIN ERROR.

POINT III

THE TESTIMONY OF DOCTORS MICHAEL KALINA AND YURI ROJAVIN EXCEEDED THE SCOPE OF PROPER LAY OPINION AND CONSTITUTED IMPROPER EXPERT OPINION.

POINT IV

THE SENTENCE OF [FORTY-FIVE] YEARS WITH A PAROLE DISQUALIFIER OF [THIRTY-EIGHT AND A QUARTER] YEARS IS AN EXCESSIVE SENTENCE.

A.

In reviewing a motion to suppress, this court defers to the factual and credibility findings of the trial court, "so long as those findings are supported by

A-5638-18

sufficient credible evidence in the record." State v. Coles, 218 N.J. 322, 342 (2014) (quoting State v. Hinton, 216 N.J. 211, 228 (2013)). Deference is afforded "because the 'findings of the trial judge . . . are substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Reece, 222 N.J. 154, 166 (2015) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). "An appellate court should disregard those findings only when a trial court's findings of fact are clearly mistaken." State v. Hubbard, 222 N.J. 249, 262 (2015). The legal conclusions of the trial court "are reviewed de novo." Id. at 263.

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "Inherent in every Fifth Amendment analysis is the question of whether the [suspect's] statement was voluntary, and, independently, whether the law enforcement officers taking it complied with Miranda." State v. W.B., 205 N.J. 588, 605 (2011). The suspect must be clearly and unequivocally informed of his or her right to remain silent and to have an attorney present during the interrogation. Miranda, 384 U.S. at 467-68, 470.

A person can waive those rights, but the waiver must be "knowing, intelligent, and voluntary in light of all the circumstances" and, under New

13

Jersey law, the prosecutor must prove those characteristics beyond a reasonable doubt. State v. Presha, 163 N.J. 304, 313 (2000). To determine "whether the waiver of rights was the product of a free will or police coercion[,]" a court considers the totality of the circumstances. State v. Nyhammer, 197 N.J. 383, 402 (2009). Factors under that test include the suspect's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature[,] and whether physical punishment or mental exhaustion was involved." Ibid. (quoting Presha, 163 N.J. at 313).

In this case, the judge properly found that defendant knowingly, intelligently, and voluntarily waived his Miranda rights. After viewing the interview and considering the factors listed above, the judge found "defendant's command of the English language was sufficient to provide a knowing intelligent waiver" because "defendant's statements throughout the questioning were appropriate and responsive to the specific questions asked." Defendant did more than parrot back what was on the waiver form. Rather, defendant showed understanding and a willingness to talk. For example, when Krall asked if defendant understood his rights, defendant stated "[y]ou have the right to remain silent. It means I don't talk" and "[y]ou have the right to talk to lawyer. I don't

14

have a lawyer right now." Defendant also stated, "I'm willing to make a statement and answer questions. Okay. I do not want a lawyer at this time." Therefore, the colloquy demonstrates that defendant wanted to waive his rights, and the State proved beyond a reasonable doubt that defendant made a knowing, intelligent, and voluntary waiver. Presha, 163 N.J. at 313. The judge's factual findings are amply supported by the record and her legal conclusions are sound.

B.

Because defendant did not object to the judge excluding a passion/provocation jury instruction, we review the issue under the plain error standard. R. 2:10-2; see also State v. Macon, 57 N.J. 325, 337 (1971). This standard requires the error "to have been clearly capable of producing an unjust result." R. 2:10-2. Counsel's failure to object to the alleged error at the trial level can be interpreted to mean that they did not view the error as very significant. Macon, 57 N.J. 325 at 333.

Generally, "courts are required to instruct the jury on lesser-included offenses only if counsel requests such a charge and there is a rational basis in the record for doing so or, in the absence of a request, if the record clearly indicates a charge is warranted." State v. Denofa, 187 N.J. 24, 42 (2006). A charge is warranted when a "jury could convict on the lesser while acquitting on

the greater offense." State v. Jenkins, 178 N.J. 347, 361 (2004). "[W]hen the defendant fails to ask for a charge on lesser-included offenses, the court is not obliged to sift meticulously through the record in search of any combination of facts supporting a lesser-included charge." Denofa, 187 N.J. at 42. The court is obligated to give a lesser-included offense instruction sua sponte only "if the record clearly indicates a lesser-included charge—that is, if the evidence is jumping off the page." Ibid. "The evidence must present adequate reason for the jury to acquit the defendant on the greater charge and to convict on the lesser." State v. Brent, 137 N.J. 107, 118-19 (1994).

Passion/provocation manslaughter is applicable "when a homicide which would otherwise be murder under [N.J.S.A.] 2C:11-3, other than felony murder, is 'committed in the heat of passion resulting from a reasonable provocation.'" State v. Galicia, 210 N.J. 364, 378-79 (2012) (quoting N.J.S.A. 2C:11-4(b)(2)). Thus, "murder can be downgraded to voluntary manslaughter by virtue of a finding of passion/provocation." Id. at 380. Passion/provocation manslaughter consists of four elements: "the provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying." State v. Mauricio, 117

16

N.J. 402, 411 (1990). "The first two criteria are objective, and the latter two are subjective." State v. Funderburg, 225 N.J. 66, 80 (2016). In considering whether the provocation was adequate, it is well established that mere words, even if offensive or upsetting, do not constitute adequate provocation for committing a homicide. State v. Crisantos, 102 N.J. 265, 274 (1986).

Here, the judge did not commit plain error in not instructing the jury on a passion/provocation charge, because the record did not support the defense. It is undisputed that defendant became "really, really upset" and "really, really angry" when Jeon tried to write defendant a check and informed defendant that she was married and living with another man. At no point did Jeon threaten defendant or take any kind of action to constitute adequate provocation. Defendant reacted solely based on Jeon's words. Furthermore, defendant had the benefit of the lesser included offenses of reckless manslaughter and aggravated manslaughter, and the jury still convicted him on the more serious charge of murder. There was no error.

C.

Defendant did not object to the admission of Dr. Kalina and Dr. Rojavin's testimony. Thus our review is for plain error; and the error must "have been clearly capable of producing an unjust result." R. 2:10-2.

17

Pursuant to N.J.R.E. 701, a trial court may admit the testimony of a lay witness in the form of opinion if that testimony "(a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." Our Supreme Court has long recognized that a treating physician can testify as a lay witness under N.J.R.E. 701. See Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 563 (2016).

Due to their unique status, the Court has adopted an expansive view of the scope of questions which may be asked of treating physicians. Hutchinson v. Atl. City Med. Ctr.-Mainland, 314 N.J. Super. 468, 479 (App. Div. 1998). Treating physicians may testify about any subject relevant to a patient's diagnosis, treatment, and prognosis without being qualified as an expert. Stigliano v. Connaught Lab'y, Inc., 140 N.J. 305, 314 (1995). To the extent a particular matter in issue requires medical testimony beyond testimony about diagnosis and treatment of a patient, expert testimony may be required. Delvecchio, 224 N.J. at 579. Accordingly, where a party seeks to have their physician testify to topics beyond the scope of diagnosis and treatment, the physician's testimony must conform to the rules regarding expert testimony in N.J.R.E. 702 and 703. Ibid.

In this case, Dr. Kalina and Dr. Rojavin's testimony was limited to their diagnosis, treatment and prognosis of the victim. Dr. Kalina testified about Jeon's condition upon arrival, her treatment plan, her initial surgery, and her lasting injuries. Dr. Rojavin testified about procedures he performed on Jeon, complications that arose while she was at the hospital, and her discharge prognosis. Defendant makes the unsupported argument that the scientific and medical testimony from Dr. Kalina and Dr. Rojavin as the treating physicians was critically important. Defendant, however, fails to indicate how such testimony was "critically important." Dr. Hellman conducted an autopsy and made the independent finding that Jeon died from complications of multiple stab wounds to the neck with cervical spinal cord infarction and paraplegia, which lead to pneumonia. The judge's admission of the doctors' testimony was not plain error.

D.

We review a sentence under an abuse of discretion standard. State v. Miller, 237 N.J. 15, 28 (2019). We "consider whether the trial court has made findings of fact that are grounded in competent, reasonably credible evidence and whether 'the factfinder [has] appl[ied] correct legal principles in exercising its discretion.'" State v. Blackmon, 202 N.J. 283, 297 (2010) (alternations in

19

original) (quoting State v. Roth, 95 N.J. 334, 363 (1984)).  Nor do we substitute our judgment for that of the sentencing court.  State v. Fuentes, 217 N.J. 57, 70 (2014).  A sentence will be affirmed unless it violated the sentencing guidelines, relied on aggravating or mitigating factors not based on competent and credible evidence in the record, or applied the guidelines in such a manner as to "make[] the sentence clearly unreasonable so as to shock the judicial conscience." Miller, 237 N.J. at 28 (quoting Fuentes, 217 N.J. at 70).

When sentencing a defendant, a court must identify and balance the aggravating and mitigating factors pursuant to N.J.S.A. 2C:44-1(a) and (b) and explain the factual basis supporting its findings.  Fuentes, 217 N.J. at 72-73.  "It is sufficient that the trial court provides reasons for imposing its sentence that reveal the court's consideration of all applicable mitigating factors" in reaching its decision.  State v. Bieniek, 200 N.J. 601, 609 (2010).  "After balancing the factors, the trial court may impose a term within the permissible range for the offense."  Id. at 608.

Guided by these principles, we reject defendant's claim that his sentence was excessive.  On the murder charge, the judge sentenced defendant to forty-five years' imprisonment, which is within the permissible range of between thirty years and life imprisonment.  N.J.S.A. 2C:11-3(b)(1).  The judge was

20

required to impose a thirty-eight and a quarter year period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2(a). In her consideration of applicable aggravating and mitigating factors, the judge made the specific finding that defendant might reoffend because "if you were to be out and get in another relationship, it could happen again, if you love someone else and they don't love you back." Her conclusion was amply supported by defendant's actions during the trial and sentencing hearing. Specifically, during his sentencing hearing testimony, defendant did not apologize for his actions, but rather made statements such as "right now I am here, I'm sitting here in this seat, that's because of this person who I still love . . . because of her lies and because of her fraud acts" and "this happened [accidentally] because of her lie. Her lie and to me it was a total betrayal." The judge's finding was based on her observation of defendant's refusal to take responsibility for his actions, his continuous blaming of the victim, and his inability to control his rage. Therefore, the judge did not abuse her discretion in sentencing defendant. Defendant's sentence does not violate statutory or judicial guidelines for sentencing, nor does it shock our judicial conscience. See Miller, 237 N.J. at 28; Fuentes, 217 N.J. at 70.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

22                                                    A-5638-18